# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL STALLINGS,** | : | **Case  No. 5:05-CV-722** |
| | : | |
| **Petitioner,** | : | |
| | : | **JUDGE KATHLEEN M. O'MALLEY** |
| **vs.** | : | |
| | : | |
| **MARGARET BAGLEY, Warden,** | : | **MEMORANDUM OF OPINION** |
| | : | **& ORDER** |
| **Respondent.** | : | |

Michael Stallings petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Stallings challenges the constitutional sufficiency of his conviction by a jury for aggravated capital murder and also challenges the constitutionality of the imposition of a sentence of death.

For the reasons set forth below, Stallings's petition for a writ of habeas corpus will be **GRANTED** in part and **DENIED** in part.  Specifically, the Court grants Stallings a writ of habeas corpus as it pertains to his claim of ineffective assistance of trial counsel at the mitigation phase of trial.  The Court denies habeas relief for all other grounds for relief raised in the petition.  The Respondent shall either: (1) set aside Stallings's sentence of death; or (2) conduct another penalty phase.  This shall be done within 180 days from the effective date of this Order.  On this Court's own motion, execution of this Order and, hence, its effective date, is stayed pending appeal by the parties.

**I. PROCEDURAL HISTORY**

On June 3, 1997, Stallings was indicted on five counts.  The first count was for

aggravated murder in violation of Ohio Revised Code § 2903.01(B)(felony murder).  This charge

contained two death penalty specifications pursuant to Ohio Revised Code § 2929.04(A)(7): that

Stallings killed the victim, Rolisha "Michelle" Shephard, during the commission of an

aggravated robbery and aggravated burglary; and, that he was the principal offender of this

murder.  Stallings was also charged with the following: attempted aggravated murder of

Christopher Williams, Jr., in violation of Ohio Revised Code § 2923.02 and § 2903.01(B); two

counts of aggravated robbery in violation of Ohio Revised Code § 2911.(A)(1) and (A)(3); and

aggravated burglary in violation of Ohio Revised Code § 2911.11(A)(1) and (A)(2).  Each charge

contained a firearm specification.[1]  The charges of aggravated attempted murder and one count of

aggravated robbery were dismissed prior to trial.  Stallings pled not guilty to all charges and

specifications in the indictment on June 4, 1997.

On September 11, 1997, Stallings moved and was granted permission to sever his trial

from co-defendants Marc Lee and Donzell Lewis.  Concurrently, Stallings filed a motion to

suppress statements he had previously made.  After conducting a hearing on the issue, the trial

court denied the motion.

A jury trial began on February 10, 1998.  The jury found Stallings guilty of all counts and

specifications remaining in the indictment.  The penalty phase of trial commenced on February

17, 1998.  One day later, the jury found that the aggravating circumstances outweighed the

---

[1]       The indictment also charged Stallings's co-defendant, Marc Lee, with one count
         of aggravated murder.

-2-

mitigating factors and recommended a sentence of death.  The trial court accepted the jury's

recommendation on February 25, 1998.  The court also sentenced Stallings to ten years of

imprisonment on the aggravated robbery charge, ten years on the aggravated burglary charge, and

three years on each of the three firearm specifications.

Stallings appealed the verdict and sentences on April 3, 1998.  Represented by Lawrence

J. Whitney and Renee W. Green, Stallings filed a brief in the Ohio Supreme Court alleging

sixteen propositions of law.  The Ohio Supreme Court affirmed the convictions and sentences on

July 19, 2000.  State v. Stallings, 731 N.E.2d 159 (Ohio 2000).

While his direct appeal was pending, Stallings also filed a petition for post-conviction

relief pursuant to Ohio Revised Code § 2953.21.  Represented by Laney J. Hawkins and Jonathan

A. Woodman of the Ohio Public Defender's Office, Stallings raised twenty grounds for relief.

Unpersuaded by Stallings's allegations, the post-conviction court dismissed the petition on April

26, 1999.  State v. Stallings, No. CR-97-05-1118(A), slip op. (Ohio Ct. Common Pleas Apr. 26,

1999).  Stallings appealed the post-conviction court's decision to the Ninth District Court of

Appeals.  That court affirmed the post-conviction court's findings.  State v. Stallings, No. 19620,

2000 WL 422423 (Ohio Ct. App. Apr. 19, 2000).  Stallings appealed the Ninth District Court's

ruling to the Ohio Supreme Court on June 5, 2000.  The court declined to exercise jurisdiction.

State v. Stallings, 734 N.E.2d 835 (Ohio 2000)(Table).  Stallings petitioned for a writ of

certiorari to the United States Supreme Court, but the Court denied certiorari on February 20,

2001.  Stallings v. Ohio, 531 U.S. 1158 (2001).

Alleging that his appellate counsel were ineffective on his first appeal as of right,

Stallings filed an application to reopen his direct appeal pursuant to Ohio Rule of Supreme Court

-3-

Practice XI(6).[2]  The Ohio Supreme Court denied the application to reopen on February 7, 2001.

State v. Stallings, 741 N.E.2d 893 (Ohio 2001)(Table).  Although Stallings appealed this

decision to the United States Supreme Court, the Court denied Stallings's petition for a writ of

certiorari on October 1, 2001.  Stallings v. Ohio, 534 U.S. 836 (2001).

Stallings filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on

January 14, 2002.  Stallings v. Bagley, No. 5:02 CV 24 (N.D. Ohio Jan. 14, 2002)(Doc. No. 10).

The parties thereafter filed motions and briefs in this action until June 19, 2002.  On that date, the

United States Supreme Court issued its opinion in Atkins v. Virginia, 536 U.S. 304 (2002),

holding that it is unconstitutional to execute the mentally retarded.  Asserting his mental

disabilities qualified him for this status, Stallings filed a motion to stay his federal habeas action

pending a return to state court to pursue a claim under the Atkins holding.  (Doc. No. 28).  On

September 30, 2002, the Court denied Stallings's motion and instead dismissed his petition

without prejudice so that he could litigate his mental retardation claim.  (Doc. No. 45).

Stallings filed a successor post-conviction petition in state court on July 3, 2002.  The

post-conviction court held a hearing on the matter on August 28 and September 4, 2003.  On

January 16, 2004, the post-conviction court denied Stallings's successor post-conviction petition

---

[2]    That Rule states in pertinent part:
> **Section 6.  Application for reopening**
> (A) an appellant in a death penalty case involving an offense committed on
> or after January 1, 1995, may apply for reopening of the appeal from the
> judgment of conviction and sentence, based on a claim of ineffective
> assistance of appellate counsel in the Supreme Court.

Supreme Ct. Prac. R. XI(6).  Because capital defendants whose crimes were
committed after January 1, 1995, appeal their conviction and sentence directly to
the Ohio Supreme Court, rather than to the Ohio Court of Appeals, this Rule was
meant to provide such defendants a forum in which to assert ineffective assistance
of appellate counsel.

on the merits.  State v. Stallings, No. CR 1997 05 1118(A), slip op. (Ohio Ct. Common Pleas

Jan. 16, 2004).  Stallings appealed the post-conviction court's decision on February 11, 2004.

The Ninth District Court of Appeals affirmed the post-conviction court's decision.  State v.

Stallings, No. 21969, 2004 WL 1932869 (Ohio Ct. App. Sept. 1, 2004).  Stallings appealed that

decision to the Ohio Supreme Court.  That court declined to exercise jurisdiction and dismissed

the appeal on January 26, 2005.  State v. Stallings, 821 N.E.2d 577 (Ohio 2005)(Table).

Stallings renewed his request for habeas corpus relief in this Court on March 11, 2005.  The

procedural history of this current action is described in Section III, below.

## II. FACTUAL HISTORY

In its consideration of Stallings's direct appeal, the Ohio Supreme Court set out the

factual history of this case, as revealed by the evidence adduced at Stallings's trial.  The facts

surrounding the underlying incident are as follows:

> On December 15, 1996, in Akron, Ohio, Michael Stallings,
> defendant-appellant, agreed with two gang accomplices, Marc Lee ("Lee") and
> Donzell Lewis ("Lewis"), to rob Eric Beverly ("Beverly"), a reputed local
> marijuana dealer. Lee furnished a shotgun to defendant, and defendant went with
> Lewis to an apartment belonging to Beverly's girlfriend where Beverly was
> visiting. Defendant entered, demanded money and marijuana from Beverly, and
> shot sixteen-year-old Rolisha "Michelle" Shephard. Defendant then left Akron
> and was arrested in May 1997 in Cleveland.

> The evidence reveals that a few days before December 15, 1996, Stacy Lewis
> ("Stacy Lewis"), who lived at the Edgewood Apartment complex in Akron,
> overheard her boyfriend, Marc Lee, age twenty (also known as "Locc Up"),
> talking with her fourteen-year-old cousin, Donzell Lewis, about a robbery.
> However, because the intended victim knew both Lewis and Lee, they decided to
> get somebody else to rob the victim for them.

> Coincidentally, on December 15, defendant (also known as "St. Ides") and Clara
> Redd, his girlfriend, along with another woman, were driving back to Cleveland
> from Columbus. Around 6:00 or 7:00 p.m. that day, defendant and his two friends

-5-

stopped in Akron at Stacy Lewis's apartment to see Lee, whom defendant knew as a fellow "Crips" gang member from Cleveland. Lee held the rank of an "OG" or "original gangster," a leadership position in the Crips, and Lewis and defendant were "BGs" (baby gangsters), or ordinary soldiers.

After defendant arrived at Stacy Lewis's apartment, he agreed with Lee and Lewis to rob a neighborhood marijuana dealer, Eric Beverly. Lee picked defendant as the gunman because he was unknown in Akron. Their plan was to have Lewis, who had previously purchased marijuana from Beverly, secure entry to the apartment of Erika White, Beverly's girlfriend, on the pretext of wanting to purchase marijuana. Once Lewis got inside, defendant, armed with a shotgun, would force his way inside and rob Beverly. Lee gave defendant a breakdown type, single-shot, sawed-off 12-gauge shotgun to carry out the agreed-upon robbery. The plan was to carry out a "simple robbery," and Lewis was to pretend that he was also a robbery victim.

Sometime after 10:00 p.m., Lewis and defendant went to Erika White's apartment. Redd waited in her car, having been told that defendant left "to go buy some weed." Lewis knocked on the back door at Erika White's apartment, and Kimberly White, Erika's sister, answered the door. When Kimberly White opened the door, she recognized Lewis as Beverly's friend, and called out to Beverly, who was sitting on the couch, "EJ, somebody want[s] you." When Kimberly White turned around, she noticed that another man, whom she did not know, was holding a gun.

Then Kimberly White screamed and yelled, "He['s] got a gun," and tried to get her cousin, Michelle Shephard, who was also visiting the apartment with Kimberly White, to leave. But Shephard did not leave, and instead picked up her fourteen-month-old son, Christopher Williams, who was sitting on the floor. Kimberly White fled out the front door. While outside, she heard Shephard say, "Please." Kimberly White later identified defendant from a photo lineup as the gunman.

Lewis testified that Kimberly White answered the back door, screamed, and then ran out the front door. Beverly was asleep on the couch, and Shephard was the only other person in the apartment aside from Christopher and one other young child upstairs.

Lewis also testified that after they entered, he stood against the wall and held his hands up, pretending that he was a robbery victim. Defendant stood about three or four feet away from Beverly, pointed the shotgun at him, and told him, "Give me the money and the weed." Shephard, who was standing by the couch holding her son, asked Beverly to "give him the marijuana and the money." Lewis also told Beverly, "Give it to him." Beverly never said anything; he was "just looking" at

defendant. According to Lewis, defendant then told Beverly, "Give me the money and the weed or I'm going to shoot your girlfriend."

While Lewis had his back turned, he heard a shot, turned around and saw Shephard on the ground. Christopher, her baby, was also on the ground, crying. Beverly went to help Shephard, and defendant left through the back door.

In his testimony, Beverly claimed to remember very little of the events that evening, since he had been sleeping, drinking, and smoking marijuana. Beverly recalled that Kimberly White and Shephard were at the apartment, but claimed he did not hear anyone come in or hear any gunshot. Beverly did hear "people hollering" and woke up to find Shephard lying on the floor bleeding. He attempted to revive her and then left. On cross-examination, Beverly admitted that he had been charged with obstruction of justice because of his lack of cooperation.

The state presented other witnesses also. Holly Setser, who lived at the Edgewood Apartments, heard a woman at 722 Edgewood screaming, "He's got a gun." Then she heard a loud "pop" noise and saw a man carrying a "sawed-off shotgun" running across a parking lot. When the man got in a parked car, the car took off. While waiting in her car, Redd also heard a shot and saw defendant running to her car, carrying a gun like a "sawed-off shotgun." After defendant jumped in Redd's car, he told her, "Get out of here."

Redd drove back to Stacy Lewis's apartment, and defendant put the shotgun in the trunk. Lee borrowed Redd's car keys in order to retrieve the shotgun. Defendant said he gave the shotgun back to Lee, but Lee denied receiving the shotgun, and police never recovered the weapon. After an hour, Redd drove to Cleveland, and then she and defendant drove to Detroit, where Redd lived.

When a police officer entered the crime-scene apartment, he first noticed a "nice big blast of [marijuana] smoke," as well as wet, clean ashtrays. Police found Shephard in the living room, lying on her back, with wounds on her left side and lots of blood. Although she had no pulse, medics took her to a hospital. Later, police discovered that Shephard's son, Christopher, had been in the apartment and had blood coming from his ear. (The evidence suggests he was injured when his mother dropped him.) Within a few days, detectives knew defendant's physical description, that he was called "St. Ides," and that he was from Cleveland or Detroit. Lewis also described that evening's events to police, but did not disclose his participation in the robbery.

The coroner found that Shephard had a large shotgun wound in her left arm and chest, causing "severe trauma to the chest, lungs, heart, veins * * * [and] bleeding was the cause of death." Her death was instantaneous, and her life could not have

been saved by any medical intervention. The coroner found gunpowder stippling on the wound and concluded that the gun muzzle was about six inches away from Shephard when she was shot.

Michael Roberts, a state forensic expert, examined the shirt that Shephard was wearing when she was shot. A hole in the shirt was consistent with having been caused by a "loose-contact" gunshot wound, and Roberts concluded that the muzzle of the shotgun must have been touching the shirt.

Following an extensive investigation, police discovered that "St. Ides" was Michael Stallings from Cleveland. Following his arrest in May 1997, defendant told police that he had stopped in Akron on December 15 to see Lee. While there, he agreed to act as the gunman for a "weed lick," i.e., a robbery of a local marijuana dealer. Lee furnished him the shotgun, which was supposed to be unloaded. According to defendant, the gun had a hair trigger and accidentally went off as defendant left the apartment. Defendant asserted that he did not think the gun was operable, that he never meant to shoot Shephard, and that Shephard was about five feet away when she was shot.

In a plea bargain, both Lewis and Lee pled guilty to certain felonies and testified at trial against defendant. In his defense at trial, defendant testified that when he agreed to do the robbery, Lee gave him a sawed-off shotgun and told him the shotgun "wasn't supposed to be loaded." After Lewis knocked on the door, he and Lewis went inside together. According to defendant, Beverly was awake, but did not hand over any money or drugs. Lewis, standing by the wall, hands up, pretending to be a victim, also told Beverly to "Give him the money and the weed." Shephard also encouraged Beverly to give up the money and drugs by telling Beverly, "Give it to him, give it to him."

After a while, defendant said he "realized [he] wasn't going to stand here and constantly argue with this man about the money and marijuana; so, [he] turned around to leave, * * * heard something drop, * * * turned around[,] and that's when the gun went off." He denied that he pulled the hammer back on the gun. After he saw Shephard fall back, he left the apartment and went to Redd's car.

Defendant admitted that he pointed the shotgun at Beverly and twice told Beverly, "Give me the money and the weed," but Beverly said nothing. Defendant denied that he ever threatened to shoot Beverly's "girlfriend," and denied that he ever saw a child in the room. Defendant admitted, however, that Lewis told Beverly to give up the money or defendant would shoot his girlfriend.

Defendant also denied that he loaded the shotgun or knew that it was loaded. Defendant claimed that Lee told him the gun was unloaded, but he admitted he

-8-

> never checked to make sure. Defendant asserted that he knew how the gun was
> loaded because he had seen Lee load it before. "[I]t took a lot of work to shut it."
> He agreed that to load it you had to break the gun open, put the shell in, then close
> it, and that "it was hard to close."

State v. Stallings, 731 N.E.2d 159, 164-166 (Ohio 2000).  Other relevant facts will be set forth

when necessary during the Court's discussion of Stallings's individual claims for relief.

### III. FEDERAL HABEAS PROCEEDING

As noted above, Stallings initially filed a notice of intent to file a petition for federal

habeas relief on January 14, 2002.  Stallings v. Bagley, No. 5:02 CV 24 (N.D. Ohio Jan. 14,

2002)(Doc. No. 10).  The Court dismissed that action once Stallings informed it that he intended

to assert an Atkins claim in state court.  (Doc. No. 45).

Upon completion of the state court proceedings, Stallings returned to this Court, filing a

petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on March 11, 2005.  Stallings v.

Bradshaw, No. 5:05 CV 722 (N.D. Ohio Mar. 11, 2005).  Stallings moved for, and the Court

appointed, Joseph E. Wilhelm and Rachel G. Troutman from the Office of the Ohio Public

Defender to represent him.  (Doc. Nos. 4; 6).  The Respondent filed a return of writ on August 1,

2005.  Stallings thereafter filed a traverse, (Doc. No. 20), to which the Respondent filed a sur-

reply on November 21, 2005.  (Doc. No. 22).

On December 13, 2005, the Court granted the parties' joint request for discovery.  (Doc.

No. 23).  Because some discovery issues remained in dispute, both parties thereafter filed

motions for further discovery.  (Doc. Nos. 24; 25).  On February 28, 2006, the Court issued an

order granting in part and denying in part Stallings's requested discovery, and granting the

Respondent's requested discovery.  (Doc. No. 31).  Stallings thereafter filed a motion for

-9-

expanded discovery and a motion to expand the record to include the depositions of trial counsel. (Doc. Nos. 33; 37).  The Court granted Stallings's motion to expand the record but found that Stallings set forth insufficient good cause to extend discovery.  (Doc. Nos. 37; 46).

On March 8, 2007, Stallings filed a motion for an evidentiary hearing.  (Doc. No. 48). After both parties requested and received permission to the enlarge the time in which to file responsive briefs, the motion became ripe for disposition on May 7, 2007.  Thereafter, the Court granted Stallings's motion for an evidentiary hearing but limited the testimony Stallings could present to no more than three  hours of witness testimony (not counting time for cross-examination); the Court allowed each party one hour for oral argument.  (Doc. No. 55). The Court set the hearing date for August 29, 2007.

After ruling on several motions in limine prior to that date, the Court held an evidentiary hearing regarding Stallings's ninth claim for relief – ineffective assistance of counsel during the mitigation phase of trial for failure to investigate and present mitigating evidence – on August 29, 2007.  Stallings presented three witnesses for testimony and presented records regarding Stallings and his history that were not presented at trial.  First, Stallings called George Hoffman, a guidance counselor and the acting principal at the Cuyahoga Hills Boys School, a Department of Youth Services ("DYS") facility, at the time Stallings attended that school.  Hoffman both authenticated Stallings's records from his time at Cuyahoga Hills and discussed his personal recollections of Stallings.  Although he had been a guidance counselor for DYS and had overseen the education of over 60,000 students as one of its employees, he had an independent recollection of Stallings because he was the only student Hoffman had ever encountered who had both a severely low I.Q. (below a score of 80), and a Severe Behavioral Handicap, or SBH, diagnosis.

-10-

While at the time Stallings attended the institution he was almost seventeen years old, Hoffman

testified that Stallings's day-to-day functioning level was approximately that of a seven-year-old

and his academic abilities were those of a first grader.  (Doc. No. 94, at 14-15).  He described

Stallings as a follower who was "picked on" much of the time by other students housed in his

cottage or dorm.  Id. at 14.  Hoffman stated that, while he was willing to testify at Stallings's

trial, defense counsel never contacted him.  Id. at 20.

Stallings next called Dorian Hall, the current supervisor of mitigation specialists and

criminal investigators in the Office of the Ohio Public Defender, to testify.  Hall provided her

opinion regarding the sufficiency of defense counsels' investigation for mitigating evidence.[3]

While Hall conceded that it is the trial attorneys who ultimately formulate mitigation strategy,

she emphasized the importance of conducting a thorough mitigation investigation by

interviewing the client and contacting former educators.  Hall averred that medical records of a

client may be scant if the client comes from a poor background for a variety of reasons.  She

stated that much of her past clients' medical care came from clinics and emergency rooms.  Hall

also testified that if there was abuse in the home, parents typically would not seek medical

treatment for a child's injuries for fear of involving the Department of Children's Services.

---

[3] As she did in a motion in limine prior to the hearing, the Respondent objected to
Hall's testimony, asserting that, because she is not a licensed attorney, she is not
qualified pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579
(1993), to provide an expert opinion.  The Court overruled the objection.  Because
it was conducting a bench hearing, rather than a trial before a jury, it decided to
hear Hall's testimony and, based on her qualifications and cross-examination,
assign whatever weight to her testimony it deemed appropriate.  The Court
concluded, moreover, that mitigation issues are not purely legal questions, and
involve psychological, educational, medical, and social questions as well.
Accordingly, the Court concluded that competent mitigation testimony did not
necessarily demand a law degree.  (Doc. No. 90, at 3).

(Doc. No. 94, at 52).

As a mitigation specialist, Hall stated that, she routinely would review a client's file for indications of organic brain damage even if medical records did not document any.  She noted in Stallings's case in particular that the record was replete with "red flags" that should have triggered counsel's duty to investigate for organic brain impairment.  Specifically, she underscored Stallings's low I.Q. and difficulty mastering long and short vowel sounds.  Id. at 59.  Most blatant were the school evaluations that indicated organic impairment or the SBH designation for Stallings.  Based on her experience with reviewing these types of records, Hall testified that, without question, counsel should have requested a neurological psychiatric evaluation to investigate for possible brain damage.  During cross-examination, Hall admitted that she is not an attorney and does not assess what information should be presented to a jury.

Stallings's final witness was Dr. Kathleen Burch, a psychologist who examined Stallings during state post-conviction proceedings.  After reviewing records from DYS, Cuyahoga Hills, and Dr. Bendo, and performing several psychological tests, Dr. Burch stated that Stallings suffers from "a moderate level of cerebral brain impairment."  (Doc. 94, at 88).   She explained that the diagnosis "moderate" is approximately a score of six in a range of one through nine.  She concluded that Stallings's brain impairment manifested in his limited ability to read and write, to plan and organize, and to self-monitor and direct his behavior.  When asked what caused this brain damage, Dr. Burch responded that several factors, such as heredity, Stalling's head injuries, and his early abuse of alcohol and drugs were all likely factors.  Id. at 97.

Dr. Burch also testified that the circumstances surrounding the murder were consistent with Stallings's limited intellectual functioning.  For instance, it is undisputed that Stallings was

-12-

recruited to participate in the robbery by gang members who were in a position of influence over him, even though he had no prior involvement with the robbery victim and no prior interest in obtaining the victim's property.  She noted, moreover, that, while his co-defendant had testified that Stallings was directed not to enter the house they intended to rob until after the others had entered, Stallings apparently could not follow that direction and proceeded to enter with them. She also observed Stallings's lack of motive for shooting the victim and his level of remorse about doing so.   During cross-examination, however, Dr. Burch did admit that, despite his impairments, Stallings had the ability to differentiate right from wrong.  Id. at 149.

Dr. Burch testified that even a psychologist who is not trained specifically in neuropsychological evaluations, but had read the DYS documents that stated Stallings suffers from "organic impairment," documentation demonstrating that he had suffered from head injuries as a child, and reports that he began abusing drugs at an early age, should have inquired further into the possibility of brain damage.  Id. at 153-54.

The Respondent thereafter called Dr. Joseph Bendo, the psychologist hired by the defense team, to testify.  Dr. Bendo stated that, at the time of trial, the only indicator of brain damage he believed was present in Stallings's case was his history of head injuries.  He said he had reviewed five psychological reports, but found nothing contained therein to indicate the presence of brain damage.  He stated that he found no evidence of brain damage in his own psychological testing and, thus, did not raise the specter of its existence in his testimony.  (Doc. No. 94, at 177). During cross-examination, however, Dr. Bendo admitted that he had reviewed files indicating that Stallings had abused drugs at an early age and that Stallings had two siblings who were low functioning, with a low I.Q.  Dr. Bendo also reviewed the Bender Gestalt test results that post-

-13-

conviction counsel had procured from the DYS records indicating organic impairment.  When

habeas counsel asked Dr. Bendo whether the results of this test indicated that Stallings suffered

from brain damage, he replied that it is "possible."  Id. at 189.   Importantly, Dr. Bendo indicated

that he discussed the possibility of Stallings's brain damage with trial counsel, but was not asked

by counsel to pursue the matter further.  He testified as follows:

> Q:      Did you have – did you indicate to [habeas co-counsel] that you discussed
>         with counsel the possibility of Michael having brain damage with trial
>         counsel?
> A:      Yes, based on the head injuries, yes.
> Q:      So did you – you did – I'm trying to – I'm trying to be fair with you.  You
>         did discuss with trial counsel the possibility that Michael could have brain
>         damage based on head injuries?
> A:      Yes.

Id. at 190.  He did not know what counsel did by way of follow-up to that discussion.

After this testimony, both parties were given an opportunity to present arguments with

respect to Stallings's claim of ineffective assistance of counsel at the mitigation phase – both as

that claim related to the evidence presented at the hearing and as it related to the remainder of the

record.  The Court thereafter adjourned the proceeding.  On December 20, 2007, after the

evidentiary hearing transcripts were filed with the Court, this matter became ripe for disposition.

(Doc. No. 94).

## IV. GROUNDS FOR RELIEF

In his petition, Stallings asserts ten (10) grounds for relief:

1.    Petitioner's right to due process was violated by prosecutor misconduct at the culpability
      phase of Petitioner's trial.

2.    Petitioner's right to due process was violated by prosecutor misconduct at the penalty
      phase of Petitioner's trial.

3.      Petitioner's right to equal protection was violated when the State of Ohio used a peremptory challenge to exclude an African-American prospective juror, Autumn Hill, from the jury on the basis of that juror's race.

4.      Petitioner's due process right to a fair trial was violated by instructional errors on the aggravated murder charge at the culpability phase of his capital trial.

5.      Petitioner's right against cruel and unusual punishment and his right to due process were violated by constitutionally infirm jury instructions at the penalty phase of his capital trial.

6.      Petitioner's right to a fair and impartial jury and his right to due process was violated by an improper contact between a witness and members of the jury.

7.      Petitioner's right to due process was violated by the ineffective assistance of counsel in Petitioner's direct appeal to the Supreme Court of Ohio.

8.      Petitioner's Sixth Amendment right to the effective assistance of trial counsel was violated by counsel's failure to object to various errors that denied Petitioner a fair trial.

9.      Petitioner's Sixth Amendment right to the effective assistance of trial counsel was violated by counsel's failure to investigate, prepare, and present compelling mitigation evidence during the penalty phase of Petitioner's trial.

10.     Petitioner's death sentence is unconstitutional because he is mentally retarded.

## V. THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended 28 U.S.C. § 2254, was signed into law on April 24, 1996.  In Lindh v. Murphy, 521 U.S. 320, 336 (1997), the United States Supreme Court held that the provisions of the AEDPA apply to habeas corpus petitions filed after that effective date.  See also Woodford v. Garceau, 538 U.S. 202, 210 (2003); Barker v. Yukins, 199 F.3d 867, 871 (6th Cir. 1999)("It is now well settled that AEDPA applies to all habeas petitions filed on or after its April 24, 1996 effective date.").  Because Stallings's petition was filed on March 11, 2005, the AEDPA governs this Court's consideration of his petition.

-15-

The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" Woodford, 538 U.S. at 206 (*quoting* Williams v. Taylor, 529 U.S. 362, 436 (2000)). The requirements of the AEDPA "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." Uttecht v. Brown, – U.S. – , 127 S.Ct. 2218, 2224 (2007)(citations omitted).  Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This legal standard establishes a multi-faceted analysis involving a consideration of both the state court's statement and/or application of federal law and its finding of facts.

With respect to Section 2254(d)(1), "clearly established federal law" refers to the holdings, as opposed to dicta, of the United States Supreme Court's decisions as of the time of the relevant state-court decision.  Williams, 529 U.S. at 412; Barnes v. Elo, 231 F.3d 1025, 1028 (6th Cir. 2000).[4]  The "contrary to" and "unreasonable application" clauses of Section 2254(d)(1)

_____

[4]    Although only Supreme Court case law is relevant under the AEDPA in examining what federal law is "clearly established," Circuit Courts of Appeals' decisions "may be informative to the extent [they] have already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court."  Hill v.

-16-

are independent tests and must be analyzed separately.  <u>Williams</u>, 529 U.S. at 412-13; <u>Hill</u>, 337 F.3d at 711.  A state court decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  <u>Williams</u>, 529 U.S. at 412-13.

Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case."  <u>Id.</u> at 413.  A state-court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  <u>Id.</u> at 407; <u>Hill</u>, 337 F.3d at 711.  As the Supreme Court recently advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold."  <u>Schriro v. Landrigan</u>, – U.S. –, 127 S.Ct. 1933, 1939 (2007)(<i>citing</i> <u>Williams</u>, 529 U.S. at 410).  The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004).  While the application of specific rules may be plainly correct or incorrect, courts may have more leeway in reasonably applying more general rules in the context of a particular case.  <u>Id.</u>

As to the "unreasonable determination of the facts" clause in Section 2254(d)(2), the Supreme Court applied that Section of 2254(d) in <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003).  In

---

<u>Hofbauer</u>, 337 F.3d 706, 716 (6th Cir. 2003).

that case, the Court noted that a "clear factual error," such as making factual findings regarding

the contents of social service records contrary to "clear and convincing evidence" presented by

the defendant, constitutes an "unreasonable determination of the facts in light of the evidence

presented." Id. at 528-29.  In other words, a state court's determination of facts is unreasonable

if its findings conflict with clear and convincing evidence to the contrary.  This analysis mirrors

the "presumption of correctness" afforded factual determinations made by a state court which can

only be overcome by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); see also Mitchell v.

Mason, 325 F.3d 732, 737-38 (6th Cir. 2003); Clark v. O'Dea, 257 F.3d 498, 506 (6th Cir.

2001)("regardless of whether we would reach a different conclusion were we reviewing the case

de novo, the findings of the state court must be upheld unless there is clear and convincing

evidence to the contrary.").  This presumption only applies to basic, primary facts, and not to

mixed questions of law and fact.  See Mason, 325 F.3d at 737-38 (holding ineffective assistance

of counsel is mixed question of law and fact to which the unreasonable application prong of

Section 2254(d)(1) applies).

By its express terms, however, Section 2254(d)'s constrained standard of review only

applies to claims that were adjudicated on the merits in the state court proceeding.  Clinkscale v.

Carter, 375 F.3d 430, 436 (6th Cir. 2004).  When a state court does not assess the merits of a

petitioner's habeas claim, the deference due under the AEDPA does not apply.  In such a case,

the habeas court is not limited to deciding whether that court's decision was contrary to or

involved an unreasonable application of clearly established federal law, but rather conducts a de

novo review of the claim.  Morales v. Mitchell, 507 F.3d 916, 930 (6th Cir. 2007)(citations

omitted); Newton v. Million, 349 F.3d 873, 878 (6th Cir. 2003); Maples v. Stegall, 340 F.3d 433,

436-37 (6th Cir. 2003).[5]  If the state court conducts a harmless error analysis but does not

indicate whether its finding is based on state or federal constitutional law, however, a habeas

court, while conducting an independent review of the facts and applicable law, must nonetheless

determine "whether the state court result is contrary to or unreasonably applies clearly

established federal law."  Maldonado v. Wilson, 416 F.3d 470, 476 (6th Cir. 2005)(*citing* Harris

v. Stovall, 212 F.3d 940, 943 (6th Cir. 2000)).

## VI.    PROCEDURAL DEFAULT

In general, a federal court may not consider "contentions of general law which are not

resolved on the merits in the state proceeding due to petitioner's failure to raise them as required

by state procedure."  Wainwright v. Sykes, 433 U.S. 72, 87 (1977).  If a "state prisoner has

defaulted his federal claims in state court pursuant to an independent and adequate state

procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate

cause for the default and actual prejudice as a result of the alleged violation of federal law, or

demonstrate that failure to consider the claims will result in a fundamental miscarriage of

justice."  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  To be independent, a state

procedural rule and the state courts' application of it "must rely in no part on federal law."

Fautenberry v. Mitchell, No. C-1-00-332, 2001 WL 1763438, at * 24 (S.D. Ohio Dec. 26,

2001)(*citing* Coleman, 501 U.S. at 732-733).  To be adequate, a state procedural rule must be

"firmly established and regularly followed" by the state courts at the time it was applied.  Ford v.

Georgia, 498 U.S. 411, 423-24 (1991); Williams v. Coyle, 260 F.3d 684, 693 (6th Cir. 2001).  If

_____

[5]     To the extent that the state court did not address a claim due to petitioner's failure
to raise it on direct review, the claim may have been procedurally defaulted.
O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999); Maples, 340 F.3d at 437-38.

a petitioner fails to present fairly any federal habeas claims to the state courts but has no

remaining state remedies, then the petitioner has procedurally defaulted those claims.  O'Sullivan

v. Boerckel, 526 U.S. at 848; Rust v. Zent, 17 F.3d at 160.

In Maupin v. Smith, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now

familiar test to be followed when the State argues that a habeas claim is defaulted because of a

prisoner's failure to observe a state procedural rule:

> First, the federal court must determine whether there is a state procedural rule that
> is applicable to the petitioner's claim and whether the petitioner failed to comply
> with that rule.  Second, the federal court must determine whether the state courts
> actually enforced the state procedural sanction -- that is, whether the state courts
> actually based their decisions on the procedural rule.  Third, the federal court must
> decide whether the state procedural rule is an adequate and independent state
> ground on which the state can rely to foreclose federal review of a federal
> constitutional claim. Fourth, if the federal court answers the first three questions
> in the affirmative, it would not review the petitioner's procedurally defaulted
> claim unless the petitioner can show cause for not following the procedural rule
> and that failure to review the claim would result in prejudice or a miscarriage of
> justice.

Williams v. Coyle, 260 F.3d 684, 693 (6th Cir. 2001)(citing Maupin, 785 F.2d at 138)(further

citations omitted).

In determining whether the Maupin factors are met, the federal court looks to the last

explained state court judgment.  Ylst v. Nunnemaker, 501 U.S. 797, 805 (1991);  Combs v.

Coyle, 205 F.3d 269, 275 (6th Cir. 2000).  "'[A] procedural default does not bar consideration of

a federal claim on habeas corpus review unless the last state court rendering a reasoned opinion

in the case clearly and expressly states that its judgment rests on a state procedural bar.'"  Morales

v. Mitchell, 507 F.3d 916, 937 (6th Cir. 2007)(quoting Frazier v. Huffman, 343 F.3d 780, 791

(6th Cir. 2003)).  Conversely, if the last state court to be presented with a particular federal claim

reaches the merits, then the procedural bar is removed and a federal habeas court may consider the merits of the claim in its review.  Ylst, 501 U.S. at 801.

If the three Maupin factors are met, the claim is procedurally defaulted.  However, the federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates that (1) there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error, or (2) a fundamental miscarriage of justice would result from a bar on federal habeas review.  Maupin, 785 F.2d at 138; Hutchison v. Bell, 303 F.3d 720, 735 (6th Cir. 2002); Combs, 205 F.3d at 274-275.

A petitioner can establish cause in two ways.  First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  Murray v. Carrier, 477 U.S. 478, 488 (1986); Mohn v. Bock, 208 F. Supp.2d 796, 801 (E.D. Mich. 2002).  Objective impediments include an unavailable claim, or interference by officials that made compliance impracticable.  Murray, 477 U.S. at 488; Mohn, 208 F. Supp.2d at 801.  Second, constitutionally ineffective assistance of counsel constitutes cause.  Murray, 477 U.S. at 488-489; Rust v. Zent, 17 F.3d 155, 161 (6th Cir. 1994); Mohn, 208 F. Supp.2d at 804.

If a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself be presented to the state courts as an independent claim before it may be used to establish cause.  Murray v. Carrier, 477 U.S. 478, 488-489 (1986).  If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the

-21-

ineffective assistance claim.  Edwards v. Carpenter, 529 U.S. 446, 452-53 (2000).

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked

to his actual and substantial disadvantage."  Perkins v. LeCureux, 58 F.3d 214, 219 (6th Cir.

1995)(*quoting* United States v. Frady, 456 U.S. 152, 170 (1982)).  "When a petitioner fails to

establish cause to excuse a procedural default, a court does not need to address the issue of

prejudice."  Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000).

Because the cause and prejudice standard is not a perfect safeguard against fundamental

miscarriages of justice, the United States Supreme Court has recognized a narrow exception to

the cause requirement where a constitutional violation has "probably resulted" in the conviction

of one who is "actually innocent" of the substantive offense.  Dretke v. Haley, 541 U.S. 386, 392

(2004)(*citing* Murray v. Carrier, 477 U.S. 478, 495-96 (1985)).  When the Supreme Court

extended this exception to claims of capital sentencing error, it limited the exception in the

capital sentencing context to cases in which the petitioner could show "'by clear and convincing

evidence that, but for constitutional error, no reasonable juror would have found the petitioner

eligible for the death penalty under the applicable state law.'"  Id. (*quoting* Sawyer v. Whitley,

505 U.S. 333, 336 (1992)).

In his traverse, Stallings concedes that grounds for relief 1, 2, 3, part of 4 (the subpart

addressing the foreseeability instruction), and 5 were raised only as ineffective assistance of

appellate counsel claims in his application to reopen the direct appeal, rather than as distinct

grounds for relief.[6]  As Stallings acknowledges, the Sixth Circuit has held that a habeas claim is

---

[6]     Stallings raises the factual underpinnings of these grounds for relief as ineffective
assistance of trial and appellate counsel claims in the seventh and eighth grounds
for relief in the petition.

exhausted only if it is raised under the same theory in federal court as it was in state court. Lorraine v. Coyle, 291 F.3d 416, 425 (6th Cir. 2002).  Thus, the underlying merits of these grounds for relief are not ripe for habeas review.[7]

Each of these issues *is* raised, however, in the context of Stallings's ineffective assistance of counsel claims – claims 7 and 8 of his petition.  While the standards to be employed in assessing these issues differ when presented solely in the context of ineffective assistance of trial and appellate counsel claims, their presence in that context requires a discussion of the merits of each.  For ease of reference, accordingly, the Court discusses the merits of each of the subparts of claims 7 and 8 in the order in which they appeared in the original petition (i.e., as claims 1 through 5), and then discusses the impact of those initial conclusions when it reaches claims 7 and 8.  In doing so, the Court is neither ignoring, nor forgiving, the admitted procedural default as to the underlying merits of claims 1, 2, 3, part of 4, and 5 as asserted in those claims.

## VII. INDIVIDUAL GROUNDS FOR RELIEF

### A. First and Second Grounds for Relief: Prosecutorial Misconduct

In these grounds for relief, Stallings asserts that the prosecution made several improper remarks during both the culpability and penalty phases of trial.  To assert a successful prosecutorial misconduct claim it "is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"

---

[7]  These grounds presumably are both unexhausted and procedurally defaulted because the time to assert them on direct appeal in the Ohio Supreme Court has expired.  Sup. Ct. Pr. R. II, § 2(A).  In any event, neither party has asserted that any state court avenues for relief remain available to Stallings.  Thus, the Court declines to speculate further on this issue.

Darden v. Wainwright, 477 U.S. 168, 181 (1986)(*quoting* Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974)); Durr v. Mitchell, 487 F.3d 423, 439 (6th Cir. 2007).  This question must be answered in light of the totality of the circumstances in the case.  Lundy v. Campbell, 888 F.2d 467, 473 (6th Cir. 1989), cert. denied, 495 U.S. 950 (1990).  The prosecutor's comments must be so egregious as to render the trial fundamentally unfair.  Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000).

A habeas court must examine the allegedly improper remarks and determine whether they were both improper and flagrant.  Broom v. Mitchell, 441 F.3d 392, 412 (6th Cir. 2006).  When reviewing claims of prosecutorial misconduct, a court must consider the following four factors: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant."  United States v. Davis, 514 F.3d 596, 613 (6th Cir. 2008)(*quoting* Broom, 441 F.3d at 412)(further citations and internal quotation marks omitted).  If a statement is not flagrant but is improper, a habeas petitioner is not entitled to relief on that claim unless the court finds that: "(1) the proof of the defendant's guilt is not overwhelming; (2) the defense counsel objected; and (3) the trial court failed to cure the impropriety by failing to admonish the jury."  Id. (*citing* United States v. Tocco, 200 F.3d 401, 420-21 (6th Cir. 2003)).

### 1. First Ground for Relief - Culpability Phase of Trial

In this ground for relief, Stallings asserts that the prosecution made improper comments when it: (a) discussed and introduced evidence about the harm caused to the victim's infant son, Christopher Williams, even though the prosecution dropped attempted murder charges pertaining

-24-

to Christopher; (b) discussed and introduced evidence regarding the good character of the victim; and (c) attempted to shift the burden of proof to Stallings.  Stallings also asserts that the cumulative effect of these improper comments prejudiced the outcome of the culpability phase of trial.  The Court now subjects these comments to the tests articulated above, finding that, while some comments were improper, the overwhelming evidence of Stallings's guilt negates any prejudicial effect on the outcome of the culpability phase of trial.

### a. Sub-claim (a) - comments regarding Christopher Williams

Stallings asserts that the prosecution commented on and elicited testimony regarding harm that befell Christopher after the shooting in an effort to evoke sympathy from the jury. Although the prosecution initially charged Stallings with the attempted murder of Christopher, it later dismissed that charge.  Stallings maintains that, because no charges pertaining to Christopher were at issue during trial, his injuries, if any, were irrelevant.  He points to several instances during the State's witness testimony in which the prosecution queried about Christopher's whereabouts and well-being, asserting that these questions were improper. Stallings also argues that the prosecutor improperly discussed Christopher during the culpability phase closing argument.

The Court finds that the testimony the prosecution elicited about Christopher's whereabouts prior to, during, and after the murder, while unnecessary, were neither "flagrant" nor improper.  The prosecution was permitted to provide the jury with an understanding of the events surrounding the murder, even if a description of those events might also have a tendency to arouse sympathy.  Thus, when questioning co-defendant, Donzell Lewis, about the events that occurred directly after the shooting, the prosecutor asked where the occupants of the apartment

-25-

were located at that time:

> Q:     And what were you doing?
> A:     Standing over [Eric Beverly] looking.
> Q:     Where was the baby at that point?
> A:     The baby was standing by me.
> Q:     This baby was right by Michelle?
> A:     By me.
> Q:     By you?
> A:     Yes.
> Q:     Still on the floor?
> A:     Uh-huh.  He got up.  The baby got up.
> Q:     I'm sorry?
> A:     The baby got up.
> Q:     The baby got up?
> A:     Yeah.
> Q:     The baby is about 14 months old, the baby was walking, right?
> A:     Yeah.
> Q:     All right.  The baby got up and did what?
> A:     The baby was just standing there crying.
> Q:     Okay.  What, if anything, did Eric Beverly do then?

(Trial Tr., Vol. 11, at 1296).  It is clear from the context of this colloquy that the prosecution's

questioning about Christopher's whereabouts, which was both preceded and followed by queries

regarding the location of others in the room, had the effect of informing the jury about the

circumstances surrounding the murder, i.e., the res gestae of the event.  Because they neither

misled the jury, nor overly prejudiced Stallings, these questions were not "flagrant."  Moreover,

as is apparent from the quote, the inquiry about Christopher was isolated, or at least relatively so,

within the meaning of the third Davis factor.  At that point in the testimony, questions regarding

the identity and location of individuals immediately following the shooting were legitimate lines

of inquiry to establish the events occurring before and after the murder.  Accordingly, Stallings's

assertion that questions put to State witnesses regarding Christopher's whereabouts constituted

prosecutorial misconduct is not well-taken.

The prosecutor's closing statements in the culpability phase, however, are problematic. After underscoring some of the testimony the prosecution elicited from its witnesses, the prosecutor argued that Michelle Shephard also "testified" through the evidence presented at trial. He depicted the "evidence" regarding Michelle's attempts to spare Christopher's life as follows:

> Then what does Michelle Shephard tell you happened?  That man right there, Michael Stallings, pulls back the hammer on that shotgun and Michelle Shephard says clearly at that point I know I am going to be shot and, worse than that, my son Christopher is in harm's way.
> So, what do I do?  I do the only thing I can think of to protect my son, and that is with that shotgun almost touching my chest, I turn to get my body between the shotgun and my son Christopher.
> And Michelle Shephard tells you, and the last word that she would be able to say is, I did that and I saved my son.
> He pulled back the hammer, he purposely pulled the trigger, he used the most deadly small arm we have to inflict that wound upon Michelle Shephard's body in a fatal area but Michelle Shephard saved her son.  He fell to the ground, he was injured but saved.

(Trial Tr., Vol. 13, at 1564).

It is clear that these comments constitute prosecutorial misconduct pursuant to the first three Davis factors.  The comments were undoubtedly prejudicial to Stallings, particularly in light of the fact that the State had dismissed the charges of attempted murder of Christopher prior to trial.   It is also clear that the prosecutor deliberately placed these comments before the jury and that the argument regarding Michelle's "testimony" about Christopher was extensive.  There is simply no excuse for the prosecution to have engaged in such blatant pandering.  Ultimately, however, despite such intentional misconduct by the prosecution, Stallings cannot establish "flagrancy" under Davis because, as described above, evidence that Stallings shot and killed Shephard was overwhelming.  Thus, the Court would not have granted relief on this claim even if Stallings had preserved it for federal habeas review.

-27-

**b. Sub-claim (b) - comments about good character of victim**

Stallings also takes issue with the prosecution's introduction of testimony about Shephard's church attendance on the morning of the murder.  He claims that the prosecutor elicited these statements to demonstrate Shephard's good character, thus prejudicing the jury against her killer.

As with the statements regarding Christopher's location, it is at least arguable that the prosecutor was merely attempting to enlighten the jury about the events that occurred on the day of the murder.  She questioned Shephard's mother, Brenda Shephard, regarding her daughter's activities on that day, as follows:

> Q:      Okay.  And where did you all go or did you go anywhere?
> A:      We went to church that morning.
> Q:      Okay.  When you say "we," who all went?
> A:      It was me, Michelle, Kimberly, Christopher and Samuel and Kenneth.
> Q:      Okay.  You went to church all together and then what happened after that?
> A:      We wasn't there that long because they had to go to church - - another church that evening; so we had left kind of early.
> Q:      Who had to go to - - I hate to keep interrupting.
> A:      Shiloh Baptist Church was going to another church that evening; so, they had let out about 1:00 and we had went to get on the van and Michelle had asked me could she go to Edgewood.  She wanted to go to Edgewood because she wanted to go see Tonya.

(Trial Tr., Vol. 10, at 1030).

It is clear from the context of the questions that, even if calculated to arouse some sympathy, the prosecutor's comments were not flagrant.  A description of Shephard's purpose for being in Beverly's apartment that day was relevant.  The prosecutor did not, moreover, expound on Shephard's church involvement or attendance practices beyond this limited colloquy.  This sub-claim has no merit.

-28-

**c. Sub-claim (c) - prosecution's alleged "burden shifting"**

Stallings argues that the prosecution acted improperly to his prejudice by shifting the burden of proof to the defense during closing argument.  This claim is based on one sentence of the prosecutor's closing argument.  After the prosecutor asserted that the State's evidence proved Stallings's guilt beyond a reasonable doubt, he stated, "[a]nd, again, if the Defense attorneys don't agree with that, they will tell you what elements are missing from those offenses."  (Trial Tr., Vol. 13, at 1539).  This comment did not call upon the defendant to produce evidence, it merely pointed out defense counsel's right to question the adequacy of the State's proof. Because it was an isolated comment, moreover, even if improper, the statement was clearly not flagrant.  Again, such comments do not warrant habeas relief where, as here, the evidence of Stallings's guilt was abundant.  Moreover, as the Sixth Circuit noted in Davis, the trial court admonished the jury while charging it that the State bears the burden of proof on all elements of the crime.  Id. at 1578.  Thus, this claim has no merit.

**d. Sub-claim (d) - cumulative effect**

Stallings's final sub-claim of his first ground for relief is that the cumulative effect of the prosecutorial misconduct that occurred during the culpability phase of the trial entitles him to habeas relief.  Here, the Court finds that only the prosecutor's closing argument comments were improper, but that Stallings cannot establish that they were flagrant within the meaning of Davis, because the evidence of his guilt was overwhelming.  Accordingly, no error occurred here that would accumulate to prejudice Stallings's trial.  Thus, this claim is not well-taken.[8]

---

[8]     Moreover, in Williams v. Anderson, 460 F.3d 789 (6th Cir. 2006), the Sixth Circuit acknowledged that, "the law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this

-29-

**2. Second Ground for Relief - Prosecutorial Misconduct at Penalty Phase**

Stallings argues that prosecutorial misconduct also tainted the penalty phase of his trial. He claims that the prosecution's introduction of the culpability phase exhibits during the penalty phase of the trial prejudiced the jury against him.  He also contends that the prosecution improperly cross-examined a defense witness about the finality of life sentences.  Finally, Stallings maintains that one of the prosecutors acted improperly when he urged the jury to consider the "nature and circumstances" of the crime as it deliberated its sentencing verdict.  The Court addresses each sub-claim sequentially.

**a. Sub-claim (a) - culpability phase exhibits**

In this sub-claim, Stallings complains that the prosecution sought, and received, the trial court's permission to introduce the culpability phase exhibits and testimony at the penalty phase of trial.   He claims that permitting the jury to consider the testimony and exhibits from the culpability phase, particularly evidence regarding the victim's good character and the injury to Christopher, was prejudicial and irrelevant to the penalty phase of the trial.

As explained above, the testimony and exhibits the prosecutor presented during the culpability phase were not improper.  While the closing arguments were inflammatory, they did not constitute evidence, and the jury was so instructed.  (Trial Tr., Vol. 13, at 1589). Accordingly, Stallings cannot reasonably assert that the introduction of *evidence*, as distinct from argument, tainted the penalty phase of trial.

---

issue."  Id. at 816 (*citing* Moore v. Parker, 425 F.3d 250, 256 (6th Cir. 2005)). But see DePew v. Anderson, 311 F.3d 742, 751 (6th Cir. 2002)(*holding* cumulative prosecutorial comments during penalty phase of trial left Court with "grave doubt" about their effect on sentencing decision).

Moreover, as the Respondent observes, the Ohio Supreme Court has held that, pursuant to Ohio Revised Code § 2929.03(D)(1), "the prosecutor, at the penalty stage of a capital proceeding, may introduce any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing."  State v. DePew, 528 N.E.2d 542, 552 (Ohio 1988)(internal quotation marks and citation omitted), rev'd on other grounds, DePew v. Anderson, 311 F.3d 742 (6th Cir. 2002).  Although the Ohio Supreme Court recognized that its ruling in DePew "appears to permit repetition of much or all that occurred during the guilt stage" of trial, it nonetheless found that the Ohio legislature intended this result, particularly in light of the State's burden to prove that the aggravating circumstances a criminal defendant is found guilty of committing outweigh any mitigating factors beyond a reasonable doubt.  Id. Thus, while the prosecution is at no time relieved of its duty to conduct its case in a constitutionally compliant manner, its motion to introduce this material in the penalty phase of Stallings's trial, especially where one of the aggravating circumstances was the underlying felony (i.e., the robbery of Beverly) that was the focus of the liability phase, is not improper in light of the Ohio Supreme Court's DePew decision.

**b. Sub-claim (b) - cross-examination of Robert Cox**

Stallings claims that the prosecution tainted the penalty phase of the proceedings during the cross-examination of defense witness Robert Cox.  Cox, a parole services coordinator, testified about the sentences from which the jury could choose.  He explained that, on July 1, 1996, the Ohio legislature enacted a bill that provided capital sentencing juries with the option of

sentencing a defendant to life in prison without the possibility of parole.[9]  On cross-examination, the prosecutor questioned Cox regarding instances where a life sentence without parole was commuted and the prisoner released, where a life-sentenced prisoner escaped from prison, where a life-sentenced prisoner committed the murder of civilians inside the prison, and where prisoners at Lucasville rioted.  (Trial Tr., Vol. 16, at 69-72).  Stallings argues that the prosecution's suggestion that a "life-without-parole" sentence created a risk that Stallings would remain a danger to society going forward was blatantly improper.

While a capital jury's consideration of a defendant's future dangerousness in its sentencing decision is not unconstitutional per se, Simmons v. South Carolina, 512 U.S. 154, 162 (1994), in Ohio the prosecution is foreclosed from raising the issue of future dangerousness because it is not one of the enumerated aggravating circumstances found in Ohio Revised Code § 2929.04(A), that a jury may consider when sentencing a capital defendant.  The Supreme Court has made clear, moreover, that, to be permissibly within the bounds of the Constitution, any consideration of future dangerousness must be tailored to the individual defendant's own propensity for future dangerousness.  California v. Ramos, 463 U.S. 992, 1008 (1983)(quoting Zant v. Stephens, 462 U.S. 862, 900 (1983)(Rehnquist, J., concurring)).  The question this Court must answer in assessing the evidence a prosecutor puts before a jury at the penalty phase of a capital proceeding is whether that evidence likely misled the jury from properly performing its task of making an individualized sentencing recommendation.  Bates v. Bell, 402 F.3d 635, 648-49 (6th Cir. 2005).  If this Court is left with "grave doubt" about whether the prosecutor's

---

[9]     Prior to this bill, capital juries could choose between two life sentence options, each of which carried the possibility of parole.  Ohio Rev. Code § 2929.03(B)(3)(a)-(b).

misconduct improperly influenced a jury's weighing of the capital sentencing factors, habeas

relief in the face of such misconduct is warranted.  Id.  See also DePew v. Anderson, 311 F.3d

742, 748 (6th Cir. 2002).

There is no doubt that the prosecutor acted improperly when eliciting testimony from Cox

and that the trial court should have prohibited the prosecutor from doing so when objections were

raised.  When reading transcripts like this, one can not help but be struck by how ill-conceived

such strategies are on the part of a prosecutor.  Stallings had been convicted of aggravated

murder in the face of overwhelming evidence of his guilt.  At that point, it was the prosecutor's

job to ask the jury to weigh fairly the aggravating circumstances of that offense against all

mitigating factors.  It was not the prosecutor's role – and should not have been the prosecutor's

desire – to attempt to assure a sentence of death, regardless of the results of that weighing.

As the Sixth Circuit observed in Hodge v. Hurley, 426 F.3d 368 (6th Cir. 2005), while

quoting a renowned Supreme Court opinion on this issue:

> the tremendous power a prosecutor may wield is accompanied by a special
> responsibility to exercise that power fairly:
>
> > [A prosecutor] is the representative not of an ordinary party to a
> > controversy, but of a sovereignty whose obligation to govern
> > impartially is as compelling as its obligation to govern at all; and
> > whose interest, therefore, in a criminal prosecution is not that it
> > shall win a case, but that justice shall be done. As such, he is in a
> > peculiar and very definite sense the servant of the law, the twofold
> > aim of which is that guilt shall not escape or innocence suffer. He
> > may prosecute with earnestness and vigor--indeed, he should do so.
> > But, while he may strike hard blows, he is not at liberty to strike
> > foul ones. It is as much his duty to refrain from improper methods
> > calculated to produce a wrongful conviction as it is to use every
> > legitimate means to bring about a just one.

Id. at 376-77(quoting Berger v. United States, 295 U.S. 78, 88 (1935)).

-33-

Here, instilling the jury with fears of Stallings's potential future dangerousness, either upon potential release or while in custody, where the prosecutor implied that the jury should premise those fears on actions and events wholly *unrelated* to Stallings himself, is inconsistent with a prosecutor's role and threatens to warp the jury's function at the penalty stage of the proceedings.

In the face of this misconduct, the Court is left to try to weigh its potential impact on the jury.  The Respondent does not try to defend the prosecutor's cross-examination of Cox.  The Respondent does not deny Stallings's claims that the questions posed were factually misleading as they related to the very events to which they referred (for instance, no commuted prisoner was ever released – all "commutations" came in the form of sentences that were commuted from death to life in prison –  and no death penalty inmates participated in the Lucasville riots).

The Respondent does not deny, moreover, that the questions had no *particularized* application to Stallings himself – i.e., Stallings had adjusted well to prison, had shown no signs of violence or dangerousness while incarcerated, and had shown remorse, not a tendency to flee from the consequences of his actions.  And, the Respondent does not argue that the matters addressed to Cox were in any way relevant to the jury's weighing function.  The Respondent claims instead that the questions posed to Cox were relatively isolated, that the prosecution did not compound the impropriety of its questioning by arguing their relevance in closing, and that the jury was properly charged regarding the factors it was to consider in its weighing process.

The Respondent contends that, even accepting that the prosecutor should not have asked Cox the series of questions about which Stallings complains, this Court need not doubt the jury's ability to discount those matters and engage in a proper sentencing determination.  The

-34-

Respondent asserts that an examination of the entire sentencing phase permits this Court to place these few questions in context and to have faith that the jury's decision was not improperly influenced by them.

Ultimately, the Court concludes, albeit somewhat reluctantly, that the Respondent is correct.  Although it is tempting to punish the prosecution for its improprieties by simply finding Stallings's claim to be well-taken, that is not the Court's function.  As noted above, this Court must determine whether those improprieties so infected the penalty phase of the proceedings that it leaves the Court with "grave doubt" that the sentencing determinations as to Stallings rested on improper grounds.  Where, as here, the improper references came in the form of cross-examination questions, rather than argument or even affirmative offers of proof by the prosecution, the issues were not raised again or given undue emphasis, the jury was presented with substantial other evidence during the penalty phase, and the charge to the jury as to its sentencing obligations was proper, grave doubts regarding the jury's ability to base its decision on proper grounds simply do not exist.[10]

The Court notes, moreover, that any lingering concern about potential prejudice to Stallings from the injection of these unfair implications of his future dangerousness are overcome by the Ohio Supreme Court's re-weighing of the aggravating circumstances and mitigating factors.  See White v. Mitchell, 431 F.3d 517, 535 (6th Cir. 2006)(*holding* trial court's comment at sentencing hearing that petitioner was "a person with dangerous propensities likely to explode

---

[10]     Stallings concedes that the cases upon which he primarily relies, i.e., Bates and DePew, where the Sixth Circuit was not able to have faith in the jury's determinations – contain evidence of prosecutorial misconduct that was far more blatant and extensive than present here.

at any time," even if improper, was cured by Ohio Supreme Court's independent re-weighing of factors).  For these reasons, the Court finds this sub-claim not sufficient to merit habeas relief.

### c. Sub-claim (c) - prosecutorial opening argument comments

Stallings's final prosecutorial misconduct claim relating to the penalty phase is that the prosecutor improperly suggested that the jury should consider the nature and circumstances of the offense as an aggravating factor.  In the opening argument, the prosecutor admonished the jury as follows:

> I just urge you, as you listen to this, to consider what you're going to do, weigh these two aggravating circumstances against these mitigating factors.
> You're going to consider the nature and circumstances of this offense. When we talk about aggravated robbery, and I don't think there's any question that the person intended to be robbed was Eric Beverly and, in this case, this Defendant, in a cold-blooded manner, in an effort to complete the aggravated robbery, turns to Michelle Shephard in an effort to convince Eric Beverly to give up the money and the drugs.

(Trial Tr., Vol. 16, at 9).

While the "nature and circumstances" of the offense are not enumerated aggravating factors, the fact that the murder occurred in the context of an aggravated burglary and aggravated robbery are.  See Ohio Rev. Code § 2929.04(A)(7).  Thus, while the prosecutor's reference to the "cold-blooded manner" of the underlying crimes was not appropriate, taken in context of the prosecutor's explanation of the aggravating circumstances the jury was appropriately permitted (and, indeed required) to weigh, and in light of the jury instructions on this issue, that one inappropriate comment was neither so flagrant nor misleading as to call into question the jury's sentencing determinations.  This sub-claim of Stalling's second ground for relief is, thus, not well-taken.

### B. Third Ground for Relief: State's use of Peremptory Challenge

Stallings contends that the State used a peremptory challenge to prevent a venire member from serving on the jury because of her race in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).  In that case, the United States Supreme Court held that a prosecutor is not permitted to use race as the basis for excusing a potential juror from serving on a jury.  Stallings asserts that the State violated <u>Batson</u> during his trial when it exercised a peremptory challenge to excuse an African-American member of the panel.

During voir dire, defense counsel objected to the State's use of a peremptory challenge to excuse Autumn Hill from jury service.  When defense counsel suggested that the State provide a race-neutral ground for exercising a peremptory challenge, the following colloquy took place at sidebar:

Prosecutor:     Your Honor, I think the record should reflect that she is a female African-American since <u>Batson</u> also applies to gender, but I'm assuming that the challenge here is due to race and <u>Batson</u> requires that a pattern be established of exclusion on the basis of race.

This is our third challenge, our previous two challenges were to Caucasians, I guess if we're using that phrase.  I don't think the Defense has established a pattern and therefore the race neutral reason is not necessary.

Defense:        Judge, I just add [sic], if it hasn't already been demonstrated on the record, that our client, Mr. Stallings, is of African-American heritage.

Court:          All right.  I'm going to note your objection for the record and further state for the record that at this time it should reflect that at this time the current makeup of the jury as it sits still includes three African-American potential jurors and no peremptory challenges have previously been exercised against an African-American at this time.

I think Mr. Carroll's recitation of the law, as it applies to <u>Batson</u>, is correct.  There has been no prior showing as of yet; so, there's no reason to insist we put a race neutral reason on the record.  I'm going to excuse her and overrule your objection at this time.

(Trial Tr., Vol. 9, at 968-9).

Based on this colloquy, Stallings argues that the prosecution articulated, and the trial court accepted, a misapprehension of the Batson test.   Although the United States Supreme Court had held in Swain v. Alabama, 380 U.S. 202 (1965), that a criminal defendant must demonstrate "systematic exclusion of blacks as a matter of policy by the [prosecutor's] office" – i.e., a historical pattern of raced-based strikes – in order to prevail on an equal protection claim, Miller-El v. Dretke, 545 U.S. 231, 236 (2005)(internal quotation marks and citation omitted), the Batson Court subsequently altered those requirements.   Finding that the Swain test's requirement that a defendant prove longstanding prosecutorial racial discrimination was "difficult to the point of unworkable," Miller-El, 545 U.S. at 239, the Batson Court permitted a criminal defendant to utilize factual inferences raised *in his or her particular case* to support an equal protection violation claim.

While the Batson Court permitted defendants, as it did under Swain, to demonstrate racial discrimination by showing a pattern of systemic discrimination by the prosecutor's office, it also created a new, less demanding, avenue by which a defendant could  make out a prima facie case. Thus, under Batson and its progeny, a criminal defendant can make out a challenge to a prosecutor's exercise of peremptory strikes in his or her specific case without reference to other, prior proceedings.  If a criminal defendant wishes to raise a Batson claim to a prosecutor's peremptory challenge, the trial court must utilize a three-step inquiry:

> First, the trial court must determine whether the defendant has made a prima facie case showing that the prosecutor exercised a peremptory challenge on the basis of race.  . . . .   Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror.  . . . . Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination.

-38-

Rice v. Collins, 645 U.S. 333, 338 (2006)(further citations omitted).   Under the AEDPA, a

habeas court can only grant relief on a Batson claim if the trial court "was unreasonable to credit

the prosecutor's race-neutral explanations for the Batson challenge," because "State-court factual

findings . . . are presumed to be correct."  Id. at 338-339 (citing 28 U.S.C. § 2254(e)(1); Miller-El

v. Dretke, 545 U.S. 231, 240 (2005)).  Stallings argues that, by not requiring the prosecution to

articulate a race-neutral reason for its peremptory strike of Ms. Hill, the trial court abdicated its

obligation under Batson.

          Stallings is correct that he is not required to establish a pattern of discriminatory strikes to

sustain a Batson challenge.  As very recent United States Supreme Court precedent instructs, a

single race-based strike can constitute a constitutional violation under Batson.  In Snyder v.

Louisiana, No. 06-10119, 2008 WL 723750 (Mar. 19, 2008), the Supreme Court held that a

criminal defendant established a Batson violation when the trial court erroneously overruled the

defendant's objections as to the exclusion of only one of two African-American prospective

jurors.  Id. at *4 (quoting United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir.

1994)("[T]he Constitution forbids striking even a single prospective juror for a discriminatory

purpose.")(further citations omitted).  Thus, the fact that Hill was the only juror subject to a

Batson claim is of no consequence here.

          The trial court's failure to articulate any meaningful finding on the record is also

significant.  In United States v. Harris, 192 F.3d 580 (6th Cir. 1999), the Sixth Circuit held that a

district court's failure to engage in any type of analysis of the prosecutor's motivation constituted

reversible error justifying a remand for further inquiry on the Batson question.  There, the district

court denied the Batson challenge because the jury already contained one African-American and

-39-

because the panel members who were the basis of the <u>Batson</u> objection would serve as alternates, rather than actual jurors.  The Sixth Circuit rejected the district court's reasoning and found that the district court's reliance on impermissible factors, such as the jury's composition, left it with no choice but to reverse.  <u>Id.</u> at 588.

Despite these apparent weaknesses in the trial court's rationale and the gaps in its analysis, Stallings's <u>Batson</u> challenge still can not succeed.  As noted above, the first step in the <u>Batson</u> inquiry is a defendant's obligation to make out a "prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race."  <u>Rice</u>, 645 U.S. at 339.  A criminal defendant can make out a prima facie case of purposeful discrimination by proving:

> (1) that he or she is a member of a cognizable racial group, (2) that the proponent of the strike has used peremptory challenges to remove from the venire members of the strike opponent's race, and (3) that the relevant circumstances raise an inference that the proponent of the strike excluded prospective jurors from the petit jury because of their race.

<u>United States v. Watford</u>, 468 F.3d 891, 912 (6th Cir. 2006)(*citing* <u>Batson</u>, 476 U.S. at 96; <u>United States v. Harris</u>, 192 F.3d 580, 586 (6th Cir. 1999)).  While the prima facie burden may not be "onerous," it can not be "taken for granted either."  <u>See</u>, <u>e.g.</u>, <u>United States v. Escobar-de Jesus</u>, 187 F.3d 148, 164 (1st Cir. 1999)(*quoting* <u>United States v. Bergodere</u>, 40 F.3d 512, 516 (1st Cir. 1994)).  While the first two steps of the prima facie burden can be satisfied by establishing that the defendant is of a particular race "and the prosecutor exercised a peremptory challenge to exclude at least one person of that race," more is needed to satisfy "the third and crucial requirement of a prima facie case."  <u>United States v. Sangineto-Miranda</u>, 859 F.3d 1501, 1520 (6th Cir. 1988).  An inference of intentional discrimination (required by the third element of the prima facie showing) does not arise merely because the prosecution used its strikes to exclude

members of a particular racial group, even where it uses *all* of its strikes in that fashion.  United States v. Ferguson, 23 F.3d 135, 141 (6th Cir. 1994).  See also Wade v. Terhune, 202 F.3d 1190, 1198 (9th Cir. 2000)("the fact that the juror was the one Black member of the venire does not, in itself, raise an inference of discrimination.").

An inference of discrimination might arise, for example, from an unexplained pattern of strikes against jurors of one race, from the prosecutor's handling of jurors during the voir dire process generally or from some characteristic relating to the juror who is the subject of the challenged strike.  Sangineto-Miranda, 859 F.2d at 1520.  Some showing must be made to justify the inference, however.  In this regard, "[t]he defendant has the burden of producing a record in support of a prima facie claim of purposeful discrimination."  Id.  It is true, moreover, that, while the prosecution may assist the defense in creating a record by tendering the reasons for its strikes before the prima facie process is completed, it "is under no obligation to help establish the prima facie case."  Id.  Where the defendant has put nothing in the record from which a reviewing court can discern an inference of discrimination, no burden shifting occurs and no further inquiry by the trial court is needed.  Id.[11]

Here, the record Stallings proffers on this Batson challenge offers this Court very little.  As noted, the trial court found no pattern of discrimination (because there was none at that point) and Stallings's trial counsel suggested no other grounds from which an inference of discrimination might arise.  Unlike in Harris, where the Court found that the question of whether

---

[11]      The Sixth Circuit has suggested that information regarding the racial composition of the original venire, the number of strikes allowed and used, and the manner in which all strikes were exercised are all pertinent facts for a court to consider. Sangineto-Miranda, 859 F.2d at 1520.

a prima facie showing had been made was rendered moot by the prosecutor's decision to volunteer his race-neutral reasons for the use of his strikes against African-Americans, the prosecution did not waive the defendant's initial burden here.  Stallings does not explain how later strikes were exercised, or whether he renewed his original challenge in the face of those later strikes.  And, he provides no detail beyond that provided by the trial court regarding the racial composition of the original venire, or even of the final panel.  Under such circumstances, this Court can not conclude that Stallings made the prima facie showing necessary to further inquiry into his <u>Batson</u> challenge.  Indeed, while Stallings says the trial court articulated the wrong standard when it referred to the absence of a "pattern" in ruling on his objection, it is possible the trial court was merely pointing out Stallings's failure to establish that the circumstances of the strike warranted an inference of discrimination, based on a case-specific pattern, or otherwise.

Ultimately, the Court concludes that, because the burden was on Stallings to make a prima facie showing of discriminatory intent and Stallings did not satisfy that burden, Stallings's <u>Batson</u> claim is not well-taken.  Thus, even if it were not defaulted and had been appropriately preserved and presented to this Court for review (which, as discussed below, it was not), the Court would find it to be without merit.[12]

### C. <u>Fourth and Fifth Grounds for Relief: Erroneous Jury Instructions</u>

Stallings next complains that the trial court erroneously charged, or failed to charge, the

---

[12]     The Court reviews Stallings's ineffective assistance of appellate counsel claim for failure to raise a <u>Batson</u> claim on direct appeal in the seventh ground for relief, <u>infra</u>, and discusses the impact of procedural default of this claim there.

jury in several instances during both the culpability and penalty phases of trial.  He claims that the trial court's instructions regarding "causation" and "purpose" were unconstitutional.  He also asserts that the trial court should have charged the jury regarding "accident."  In the penalty phase of trial, Stallings asserts that the trial court erred when it admonished the jury to consider all relevant evidence and in its definition of mitigating factors.

For habeas corpus relief to be warranted on the basis of an incorrect jury instruction, a petitioner must show more than "the instruction is undesirable, erroneous, or even universally condemned."  Estelle v. McGuire, 502 U.S. 62, 72 (1991)(citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)) A petitioner must establish that, taken as a whole, the instructions were so infirm that they rendered the entire trial fundamentally unfair. Id.; Henderson v. Kibbe, 431 U.S. 145, 154 (1977); Hardaway v. Withrow, 305 F.3d 558, 565 (6th Cir. 2002); Buell v. Mitchell, 274 F.3d 337, 355 (6th Cir. 2001).

Because jury instruction errors typically are matters of state law, the standard for demonstrating that a jury instruction caused constitutional error in a habeas proceeding "is even greater than the showing required to establish plain error on direct appeal."  Henderson, 431 U.S. at 154.  A habeas petitioner's "burden is especially heavy [when] no [affirmatively] erroneous instruction was given . . . .  An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  Id. at 155.  Applying this standard, the Court turns to Stallings's individual erroneous instruction claims.

### 1. Fourth Ground for Relief - Culpability Phase Instructions

### a. Sub-claim (a) - "causation" instruction

Stallings asserts that the trial court's instruction regarding "causation" is constitutionally

-43-

infirm.  He claims that the instruction relieved the State of its burden of proving that Stallings

specifically intended to cause Shephard's death.  As noted above, the Respondent asserts that this

claim is procedurally defaulted because, although Stallings raised it as an ineffective assistance

of appellate counsel claim in his application to reopen the direct appeal, he failed to raise it as an

independent claim to the Ohio Supreme Court on direct appeal.  Moreover, trial counsel did not

object to this instruction during trial.[13]   Thus, as Stalling concedes in the traverse, this claim is

procedurally defaulted.

This claim lacks merit in any event.  The instruction that the trial court provided in

Stallings's trial is almost identical to one the Sixth Circuit upheld in Byrd v. Collins, 209 F.3d

486, 527 (6th Cir. 2000).  This Court has reviewed similar instructions on numerous occasions

and, on the authority of Byrd, refused to grant habeas relief on that ground.  See, e.g., Phillips v.

Bradshaw, No. 5:03CV875, slip op., at 91 (N.D. Ohio Sept. 29, 2006)(Doc. No. 96).  It adheres

to that view here.

### b. Sub-claim (b) - "purpose" instruction

Stallings claims that the trial court's instruction regarding the purpose to kill relieved the

State's burden of proving the mens rea element of aggravated murder.  Stallings raised this issue

---

[13]     If a defendant fails to object to a trial error that would affect a substantial right,
then the appellate courts will conduct a plain error analysis of that claim.  State v.
Slagle, 605 N.E.2d 916, 925 (Ohio 1992). Additionally, Ohio Rule of Criminal
Procedure 52(B) provides for only a plain error review when trial issues are not
properly preserved for appeal:
> **(B) Plain error**
> Plain error or defects affecting substantial rights
> may be noticed although they were not brought to
> the attention of the court.
Ohio R. Crim. P. 52(B).

on direct appeal to the Ohio Supreme Court and it is therefore preserved for federal habeas review.

When charging the jury, the trial court's instruction regarding "purpose" was as follows:

> Purpose to cause the death is an essential element of the crime of aggravated murder.
>
> A person acts purposely when it is his specific intention to cause a certain result.  It must be established in this case that at the time in question there was present in the mind of the Defendant a specific intention to cause the death of Rolisha Michelle Shephard.
>
> Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result.  To do an act purposely is to do it intentionally and not by accident.  Purpose and intent mean the same thing.
>
> The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct.
>
> The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means or weapon used, and all the other facts and circumstances in evidence.
>
> If a wound is inflicted upon a person with a deadly weapon in the manner calculated to destroy life or inflict great bodily harm, the purpose to cause the death may be inferred from the use of the weapon.  The inference is not conclusive and purpose is determined from the facts and circumstances in evidence.
>
> Unless the Defendant had the required purpose, he is not guilty of the crime of aggravated murder.
>
> In determining whether the Defendant had the required purpose, you will consider whether he acted under a mistake of fact regarding whether the weapon was loaded and/or inoperable.  If the Defendant had an honest belief arrived at in good faith in the existence of such facts and acted in accordance with the facts as he believed them to be, he is not guilty of aggravated murder as a purpose to cause the death of Rolisha Michelle Shephard is an essential element of that offense.

(Trial Tr., Vol. 13, at 1568-70).

Prior to instructing the jury, the trial court entertained counsel's objections to the jury

-45-

instructions.  Defense counsel objected to the paragraph in the instruction pertaining to the use of a deadly weapon.  Rather than charging that purpose can be inferred from the use of a deadly weapon in a manner calculated to cause death or bodily harm, defense counsel argued that the instruction should have read that purpose can be inferred by the use of a deadly weapon "[i]f a wound is inflicted upon a person calculated to cause the death as opposed to inflict great bodily harm."  Id. at 1516.  The trial court overruled the objection.

On direct appeal, the Ohio Supreme Court held that the instruction was sound pursuant to Ohio law.  State v. Stallings, 731 N.E.2d 159, 172 (Ohio 2000).  Moreover, it emphasized that the trial court informed the jury that it *may*, not *must*, infer purpose from the use of a deadly weapon, and specifically charged the jury that any such inference was not conclusive.

This instruction was not erroneous under Ohio law, much less constitutionally infirm. The trial court indicated to the jury that it could find purpose based on Stallings's use of a deadly weapon to cause death or great bodily harm, but that it was not required to do so.  Thus, there is no merit to Stallings's assertion that this instruction diminished the State's responsibility to prove, and for the jury to find, that Stallings formed the specific intent required to be found guilty of aggravated murder.

### c. Sub-claim (c) - failure to instruct on "accident"

Stallings argues in this sub-claim that the trial court should have heeded defense counsel's request to instruct the jury regarding "accident," as that was the crux of his defense at trial.  As the Ohio Supreme Court observed on direct appeal, and as quoted above, the trial court instructed the jury that "[t]o do an act purposely is *to do it intentionally and not by accident*. Purpose and intent mean the same thing."  State v. Stallings, 731 N.E.2d at 172 (emphasis in

original). This instruction must be read, moreover, in combination with the above-quoted instruction telling the jury that, if the defendant operated under a good faith mistake of fact, he could not be found to have acted purposefully. As the Ohio Supreme Court concluded, the jury was clearly told that, if the jury found that Stallings did not intentionally fire the weapon, or did so mistakenly, then it could not find that Stallings purposely killed Shephard, and, consequently, it could not convict him of aggravated murder. The Ohio Supreme Court opined that

> the defense claim of accident simply "constitutes a denial or contradiction of evidence offered by the prosecution to prove an intent to kill." State v. Poole (1973), 294 N.E.2d 888, 890. Here, the trial court instructed the jury on mistake of fact, as to whether defendant knew the gun was loaded, and on the lesser-included offense of involuntary manslaughter. If the jury had any reasonable doubt as to whether defendant purposefully killed Shephard, then it would have found him guilty of that lesser-included offense. The jury could not have reasonably acquitted him of wrongdoing in the killing, since he was engaged in a robbery at the time. Accord State v. Bates (1976), N.E.2d 584, 589, judgment vacated on other grounds by (1978), 438 U.S. 910.

Id. (parallel citations omitted).

The court's reasoning is not clearly contrary to any United States Supreme Court precedent. It found that, pursuant to Ohio law, the trial court's refusal to instruct on the definition of "accident" was without import because the trial court charged the jury that if it did not find that Stallings acted purposely, it could not convict him of aggravated murder. This instruction did not render Stallings's trial unfair as it required the jury to find all elements necessary to convict for aggravated murder and provided them with the option of convicting Stallings of the lesser-included offense of manslaughter if they found that Stallings killed without purpose, i.e., by accident. This sub-claim is not well-taken.

## 2. Fifth Ground for Relief - Penalty Phase Instructions

Stallings maintains here that two of the trial court's penalty phase instructions tainted the

outcome of his trial.  He argues that, when the trial court instructed the jury to consider all "relevant" evidence after it had admitted all the culpability phase evidence into the penalty phase, but failed to inform the jury what evidence was specifically relevant to prove the felony-murder death specification, it left to the jury the decision of what culpability phase evidence was legally relevant to find that factor.  Additionally, Stallings asserts that the trial court erred when it defined mitigating factors as evidence that would reduce his "blame or punishment" for the offense.  Stallings raised neither claim on direct appeal, asserting them for the first time in his application to reopen the direct appeal.  Accordingly, as Stallings concedes, these sub-claims are procedurally defaulted.

They also are without merit.  First, the Court finds no merit to Stallings's claim that the jury was left with the impression that it could consider any culpability phase evidence to prove the felony-murder aggravating factor.  As the Respondent notes, the trial court instructed the jury that "murder alone is not an aggravating circumstance."  (Trial Tr., Vol. 16, at 167).  It thereafter charged the jury on the findings it must make to find the felony-murder aggravating circumstance.  Thus, contrary to Stallings's assertions, the jury was not left to ponder what culpability phase evidence they could consider when determining whether to find the aggravating circumstances alleged by the State.

Stallings also takes issue with the trial court's definition of mitigating factors as factors that reduce "the degree of the Defendant's blame or punishment."  Id. at 168.  He claims that this instruction allowed the jury to consider whether the mitigating evidence reduced his legal culpability for the murder, rather than merely his moral culpability.  The trial court, however, also informed the jury that mitigating circumstances should be considered "in fairness and

-48-

mercy" to reduce the sentence.  Id.  This phrase connotes the jury's consideration of mitigating factors based on moral, rather than strictly legal, grounds.  The Court finds that the trial court's use of the words "blame or punishment" did not so mislead the jury regarding the nature of how they were to find mitigating factors that it rendered the outcome of the penalty phase proceedings unfair.  This claim has no merit.

### D. Sixth Ground for Relief: Improper Contact with Jurors

Stallings alleges that he was denied due process of law and the right to a fair trial when a man, who was later identified as Eric Beverly, spoke to three jurors impaneled for his trial who were on a courthouse stairwell as they were returning from lunch.  Beverly stated that "nothing short of the death penalty would be satisfactory," then repeated the statement two or three times. (Trial Tr., Vol. 10, at 1081).  The three jurors then walked away immediately and reported the incident to the trial judge's staff attorney.  Thereafter, the trial judge individually voir dired each jury member about the statement.  Two jurors stated that, while they heard the statement, they would not be influenced by it.  Id. at 1083; 1086.  The third juror responded that he did not hear the statement.  Id. at 1088-89.

The due process clause of the United States Constitution states that a criminal defendant has the right to be tried by a fair and impartial jury.  The right to due process, however, does not necessarily require a new trial in every instance in which a juror is potentially biased.  Smith v. Phillips, 455 U.S. 209, 217 (1982).  Rather, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  Id. (*citing* Remmer v. United States, 347 U.S. 227 (1954)).

In <u>Zuern v. Tate</u>, 336 F.3d 478 (6th Cir. 2003), the Sixth Circuit held that, when a habeas court addresses a claim of juror misconduct it, must consider four points: (1) whether the state court held a hearing; (2) that no presumption of prejudice arises from any improper contact; (3) that the petitioner bears the burden of proving actual bias; and (4) that juror testimony at a hearing is not inherently suspect.  <u>Id.</u> at 486 (*quoting* <u>United States v. Rugerio</u>, 20 F.3d 1387, 1390 (6th Cir. 1994)).  The <u>Zuern</u> Court found that the petitioner's juror misconduct claim had no merit because the trial court held a hearing on the issue and found that the juror in question could be fair and impartial, and defense counsel failed to object to the juror's continued presence on the panel.  <u>Id.</u>

Here, the Ohio Supreme Court analyzed this claim on direct appeal.  It held:

> In proposition of law IX, defendant argues that the trial court should have declared a mistrial due to "a possibility that the impartiality of three * * * jurors was affected by an improper comment outside of the courtroom."

> Following a lunch break during the trial, as jurors were walking up a staircase, "a tall black gentleman * * * said to the three of us [Clemens, Johnston, and Brettschneider] that 'nothing short of the death penalty would be satisfactory' and repeated it two or three times." After Clemens reported this incident, the trial court, in chambers with counsel and defendant, questioned the three jurors. Clemens reported that she did not feel threatened, that there was no other conversation, that nothing was said to other jurors, and that this incident would not affect her ability to be fair and impartial.

> Juror Johnston also reported that the man said, "Anything but the death penalty would be unacceptable." Although the incident was "somewhat ominous," Johnston never felt threatened, and agreed that his impartiality or his ability to assess the man's testimony if he were a witness would not be affected. Juror Brettschneider heard a man say something, but Brettschneider "wasn't paying attention," did not know if the man was talking to them, and agreed his impartiality would not be affected. The court denied defendant's motion for a mistrial, finding the jurors answered the questions truthfully and honestly.

> After Eric Beverly testified later that day, defense counsel asserted they suspected Beverly was the man who approached the jurors. Beverly told the prosecutor that

he only said to jurors something like, "Do the right thing."

The trial court acted properly in this case by questioning the jurors and allowing counsel to question them. "When a trial court learns of an improper outside communication with a juror, it must hold a hearing to determine whether the communication biased the juror." Phillips, 656 N.E.2d at 661-662, citing Smith v. Phillips (1982), 455 U.S. 209, 215-216 and Remmer v. United States (1954), 347 U.S. 227, 229-230. Defendant has not complained about the conduct of the hearing. Cf. State v. Henness (1997), 679 N.E.2d 686, 696-697.

Instead, defendant argues that the jurors' impartiality may have been affected. However, "[i]n cases involving outside influences on jurors, trial courts are granted broad discretion in * * * determining whether to declare a mistrial or to replace an affected juror." Phillips, 656 N.E.2d at 661. Accord Keith, 684 N.E.2d at 60. Also, the complaining party must show actual prejudice. Id. at 526, 684 N.E.2d at 60. See, also, Phillips, 455 U.S. at 215; United States v. Zelinka (C.A.6, 1988), 862 F.2d 92, 95; United States v. Sylvester (C.A.5, 1998), 143 F.3d 923, 933; Crim.R. 33(A). In this case, defendant has not demonstrated any such prejudice.

Moreover, defendant has not established that the trial court abused its broad discretion. The incident was momentary; the information given was Beverly's personal opinion, not fact; only two jurors heard the remark; and each of the three jurors declared unequivocally that they would not be affected by the event. "A juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court." Phillips, 656 N.E.2d at 661, *citing* Smith v. Phillips, 455 U.S. at 217 fn. 7.

State v. Stallings, 731 N.E.2d 159, 175 (Ohio 2000)(parallel citations omitted).

Clearly, the Ohio Supreme Court's opinion is not an unreasonable application of United States Supreme Court precedent.  First, the court identified several key Supreme Court cases such as Remmer and Phillips that involve improper juror contact.  In reviewing the claim, the court observed that the trial court held a hearing, interviewing all jurors who overheard the statement regarding whether they felt threatened or if they could remain impartial.  Moreover, as the Ohio Supreme Court noted, each juror indicated that he or she could disregard the comment, or that he or she did not hear it in the first instance.  Thus, the Ohio Supreme Court's decision to

find this claim without merit is not clearly contrary to any Supreme Court precedent, nor does it unreasonably apply the facts of the case.

Finally, Stallings contends in the traverse that Beverly's statements to the three jurors was tantamount to "victim-impact evidence."[14]   He thereafter cites to controlling Supreme Court opinions regarding the dangers posed from receipt of such evidence.   The Court finds this argument inapposite.  To constitute "victim-impact <u>evidence</u>," any information regarding the harm caused by the victim's death must, by definition, be admitted as "evidence" before the jury by the trial court.  Here, the trial court neither made such an admission nor did Beverly testify under oath to the jury regarding the sentence that Stallings should receive.  Thus, this claim must be analyzed, as it was by the Ohio Supreme Court, as an improper juror contact claim or not at all.  Stallings's assertions to the contrary lack merit.

### E. <u>Ground for Relief Eight: Ineffective Assistance During Culpability Phase</u>

Stallings claims that trial counsel were ineffective on four different occasions during the culpability phase of trial.  He asserts that counsel's conduct fell below professional norms, depriving him of the Sixth Amendment right to counsel when trial counsel failed to object to: (1) prosecutorial misconduct at the culpability phase of trial; (2) prosecutorial misconduct at the

---

[14]    The Respondent observes in the sur-reply that Stallings first raised the victim-impact issue in the traverse.  While such action typically is disfavored because it does not provide the State the opportunity to respond to new arguments, Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994), <u>see</u> <u>also</u> Jack v. Randall, No. C-2-99-947, 2000 WL 1456992, at * 7 (S.D. Ohio June 20, 2000), the Respondent here has had the opportunity to address Stallings's victim-impact assertion in the sur-reply.  Thus, no prejudice has inured to the Respondent and the Court will consider Stallings's argument.  Taylor v. Mitchell, 296 F.Supp.2d 784, 798 (N.D. Ohio Mar. 03, 2003); McGhee v. Konteh, No. 1:07 CV 1408, 2008 WL 320763, at *9 (N.D. Ohio Feb. 1, 2008).

penalty phase of trial; (3) the trial court's "foreseeability" instruction; and (4) the trial court's

relevancy instruction and its definition of mitigating factors at the penalty phase of trial.[15]  The

Respondent asserts that all of the sub-claims raised in ground eight are procedurally defaulted

because Stallings did not raise them in the Ohio courts until he filed an application to re-open his

direct appeal and they do not arise form or depend upon evidence outside the trial record.  The

Respondent is correct.  Even if not defaulted, however, the Court finds them to be insufficient to

merit habeas relief.

To succeed on an ineffective assistance of counsel claim, a petitioner must satisfy the

familiar two-prong test for ineffective assistance of counsel set forth in Strickland v.

Washington, 466 U.S. 668 (1984).   First, the petitioner must demonstrate that counsel's errors

were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by

the Sixth Amendment."  Id.  Second, the petitioner must show that he or she was prejudiced by

counsel's errors.  "This requires showing that counsel's errors were so serious as to deprive the

defendant of a fair trial, a trial whose result is reliable."  Id.

A petitioner must point to specific errors in counsel's performance.  United States v.

Cronic, 466 U.S. 648, 666 (1984).   Thereafter, a reviewing court must subject the allegations to

rigorous scrutiny, determining "whether, in light of all circumstances, the identified acts or

omissions were outside the wide range of professionally competent assistance."  Strickland, 466

U.S. at 690.  A reviewing court must strongly presume that counsel's conduct was reasonable and

might be part of a trial strategy.  Id. at 689.   "'Judicial scrutiny of a counsel's performance must

---

[15]     As noted in its discussion of ground nine, below, Stallings does not assert here
        that trial counsel were ineffective in handling the Batson challenge discussed at
        length above.

-53-

be highly deferential' and . . . 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'"  Cone v. Bell, 535 U.S. 685, 698 (2002)(*quoting* Strickland, 466 U.S. at 689).

To ascertain whether counsel's performance prejudiced a criminal proceeding, a reviewing court does not speculate whether a different strategy might have been more successful, but a court must "focus[] on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."  Lockhart v. Fretwell, 506 U.S. 364, 372 (1993).

The Court has addressed the factual underpinnings of Stallings's four sub-claims as distinct grounds for relief elsewhere in this Order and found them to not merit habeas relief.  In light of this Court's conclusions as to the underlying merits of his sub-claims, Stallings cannot establish, as he must pursuant to Strickland, that he was prejudiced by counsel's performance (even if it was deficient in certain respects).   The Court finds, accordingly, that these sub-claims and Stallings's eighth ground for relief generally are not well-taken.[16]  See Lundgren v. Mitchell, 440 F.3d 754, 770 (6th Cir. 2006)("If [a petitioner] fails to prove either deficiency or prejudice, then Petitioner's ineffective assistance of counsel claims must fail.")(*quoting* Strickland, 466 U.S. at 697).

### F. Ground for Relief Nine: Ineffective Assistance during Penalty Phase

Stallings also alleges that he received ineffective assistance of counsel during the penalty

---

[16]     Specifically, the Court addressed the factual underpinnings and legal issues of sub-claim (a) in ground for relief one; sub-claim (b) in ground for relief two; sub-claim (c) in ground for relief seven; and sub-claim (d) in ground for relief five.

phase of trial.  He argues that his counsel were deficient in several respects.  First, he claims that defense counsel failed to conduct an adequate investigation into his background and obtain all records pertaining to his psychological impediments.  Stallings argues that, had counsel requested documents from the DYS, they would have seen a document prepared by Dr. Rita Politzer that diagnosed Stallings with organic brain impairment.  And, they would have seen records of his time at DYS that disclose assessments of his functional capacity that are consistent with Dr. Politzer's diagnosis.  Stallings is also critical of the lack of a specific psychological diagnosis from defense psychologist, Dr. Joseph Bendo.  Unlike Dr. Bendo's assessment, Stallings observes, Dr. Kathleen Burch, who examined him during state post-conviction proceedings, was able to render a diagnosis of his conditions, again one consistent with that presaged by the DYS record.

Stallings then claims that counsel failed to present meaningful testimony regarding the extent of his drug abuse which he says was highly relevant to the question of his functional brain capacity.  Stallings asserts both that insufficient evidence of the extent of his drug and alcohol use was provided to Dr. Bendo so that he could assess its impact on Stallings's psychological profile and that insufficient evidence on this point was offered to the jury.[17]  He also claims that his counsel failed to develop fully the record with respect to the abuse he endured as a child.  He says several family members, such as his aunt, Rosie Butler, who had an intimate relationship

---

[17]     On this point, Stallings points out that his use of narcotics and alcohol dates back to his earliest years, when it would have had the potential to have the greatest negative effect on his intellectual functioning.  Specifically, Stallings claims the jury should have been told that his mother gave him beer as early as age five, he began using marijuana by age eight and drinking liquor by age ten.  By 16, during his adolescent development, he began smoking marijuana laced with formaldehyde.

with his nuclear family members, could have testified about the dysfunction that occurred therein more effectively than Karen Redmon, the distant cousin who testified for Stallings during trial. Finally, Stallings takes issue with counsel's failure to present any cultural mitigation testimony regarding gang membership, his reasons for seeking it, and the impact it had on his ability to make decisions on his own.

Putting these complaints together, Stallings argues that, while his trial counsel did present *some* mitigation evidence, their failure to investigate fully and develop a record with respect to critical aspects of his psychological, educational, social, and personal background was inconsistent with counsel's most basic mitigation-phase obligations.  Stallings contends, moreover, that, by putting evidence regarding his background before the jury that was not fully developed and, thus, either misstated or understated his psychological impairments, low I.Q., drug and alcohol use, and childhood abuse, the jury actually was affirmatively misled into believing that these factors were <u>not</u> severe impairments to his ability to moderate his behavior and did <u>not</u> have a severe effect on his functional capacity.  Thus, Stallings argues that counsel's failures were prejudicial, not just because they resulted in the absence of proof to the jury on important, relevant mitigation factors, but because they resulted in the presentation of inaccurate and misleading proofs on those issues.

### 1. Procedural Default

The Respondent asserts that this ground for relief and its sub-claims are procedurally defaulted on <u>res judicata</u> grounds.[18]  Although Stallings raised these grounds for relief in his state

---

[18]     In <u>State v. Perry</u>, 226 N.E.2d 104 (Ohio 1967), the Ohio Supreme Court held that any claim that was raised or could have been raised on direct appeal is barred from review on post-conviction relief under the doctrine of <u>res judicata</u>.

post-conviction petition, the Ninth District Court of Appeals held that they were barred from a

merit review.  While Stallings attached several exhibits, including the DYS records to his post-

conviction relief petition, the Ninth District found these documents inadequate to avoid applying

the res judicata bar.  It held:

> Because Defendant attached new evidence to his petition, he has argued that this
> evidence is outside the record, therefore, defeating the res judicata bar.
> Defendant's argument is not well taken. Presenting evidence outside the record
> does not automatically defeat the doctrine of res judicata. State v. Lawson (1995),
> 659 N.E.2d 362. Such evidence "must meet some threshold standard of cogency;
> otherwise it would be too easy to defeat the holding of Perry by simply attaching
> as exhibits evidence which is only marginally significant and does not advance the
> petitioner's claim[.]" Id. In addition, evidence dehors the record must demonstrate
> that the claims advanced in the petition could not have been fairly determined on
> direct appeal based on the original trial court record without resorting to evidence
> outside the record. See State v. Johnson (Sept. 10, 1997), Summit App. No.
> 18208, unreported, at 6.
>
> In light of the foregoing, Defendant failed to demonstrate that he could not have
> raised his claims on appeal. In his first through fifth claims for relief, he asserted
> that his trial counsel was ineffective by failing to offer testimony by certain
> experts. Specifically, Defendant asserted that his trial counsel failed to present the
> following: evidence of neurological brain impairment; comprehensive mitigating
> evidence during his sentencing phase; a theory of mitigation supported by
> comprehensive psychological evidence; evidence of Defendant's psychological
> history; and psychological evidence of his DSM-IV diagnosis. However, the trial
> counsel did offer an expert, Dr. Bendo, to present mitigating psychological
> evidence. Most of Defendant's evidence outside the record contradicted the
> testimony of Dr. Bendo, while the rest of the evidence merely repeated the
> psychological and behavior problems that Dr. Bendo mentioned at trial. Because
> his evidence dehors the record did not add any substance to his claims for relief,
> he failed to demonstrate that the claims could not be fully addressed based on the
> original record and raised on his appeal. Therefore, his first through fifth claims
> for postconviction relief were barred by res judicata.
>
> In his sixth through thirteenth claims for relief, Defendant asserted that his trial
> counsel failed to adequately investigate his background to present crucial
> mitigating evidence to the jury.  Essentially, Defendant asserted that the testimony
> of his family members would have helped the jury when considering the
> mitigating evidence concerning his background.  In reviewing the attached
> affidavits, this Court concludes that they are merely redundant. Defendant, Karen

> Redmon, and Dr. Bendo testified at trial about his difficult upbringing. The attached affidavits add little, if any, substance to each claim. Because his sixth through thirteenth claims could have been raised on appeal, they are barred by <u>res judicata</u>.
>
> In his fourteenth through sixteenth grounds for relief, Defendant argued that his counsel was ineffective by failing to retain an expert on firearms, gang cultures, and a toxicologist. Again, these claims could have been raised on appeal and are barred by <u>res judicata</u>. Furthermore, the attached affidavits merely contradict the strategy used by Defendant's trial counsel. Because the actions of Defendant's trial counsel appear on the face of the record, his claims are reviewable on appeal, therefore, Defendant's fourteenth through sixteenth claims are barred by <u>res judicata</u>.

<u>State v. Stallings</u>, No. 19620, 2000 WL 422423, at *1-2 (Ohio Ct. App. Apr. 19, 2000).

While the Ninth District Court of Appeals' holding would seemingly end the matter, recent Sixth Circuit jurisprudence counsels additional inquiry.  In <u>Richey v. Bradshaw</u>, 498 F.3d 344 (6th Cir. 2007), the Sixth Circuit held that a habeas petitioner's grounds for relief were not procedurally defaulted, even though the Ohio courts had barred them on grounds of <u>res judicata</u>. In that case, the Sixth Circuit found that the petitioner's ineffective assistance of counsel claims could be addressed on the merits when scientific evidence used to support the claim in state post-conviction proceedings was not part of the original trial record.  The <u>Richey</u> Court held that, contrary to the findings of the Ohio courts, the petitioner's claim was not barred by <u>res judicata</u> because, although the absence of scientific evidence was apparent from the trial record, there was no means to support the claim the petitioner raised without attaching to the post-conviction petition the scientific evidence his counsel were allegedly ineffective for failing to collect.  <u>Id.</u> at 360.

The <u>Richey</u> Court is not alone in its conclusion that an Ohio court's procedural default based finding on <u>res judicata</u> grounds is unreasonable when evidence necessary to support a post-

conviction claim is <u>dehors</u> the record.  See <u>White v. Mitchell</u>, 431 F.3d 517, 526-27 (6th Cir. 2005)(*reviewing* ineffective assistance of counsel claim even though Ohio courts found it procedurally defaulted); <u>Hill v. Mitchell</u>, 400 F.3d 308, 314 (6th Cir. 2005)(*finding* review of the merits of ineffective assistance of counsel claim appropriate despite Ohio courts' finding of <u>res judicata</u> when psychological reports not procured during trial were necessary to support the claim); <u>Greer v. Mitchell</u>, 264 F.3d 663, 675 (6th Cir. 2001)(same).

In light of <u>Richey</u> and the precedent upon which it relief, this Court must look past the procedural bar the Ninth District imposed and proceed to the merits of this claim.  While the Ninth District Court of Appeals is correct that a portion of the evidence attached to Stallings's post-conviction petition was somewhat repetitive of what was presented at trial, the bulk of it was not.  Obviously, Stallings could not have presented the DYS records regarding his brain impairment, SBH and severe functional limitations in a direct appeal ineffective assistance of counsel claim because post-conviction counsel were the first to obtain them.  Thus, it was not until post-conviction proceedings that this ground for relief arose.  Moreover, the Ninth District Court's finding that "[m]ost of Defendant's evidence outside the record contradicted the testimony of Dr. Bendo," <u>State v. Stallings</u>, 2000 WL 422423 at *2, seems to undercut its subsequent holding that the evidence regarding counsel's preparation for the mitigation phase of trial, including supplying Dr. Bendo with all pertinent documentation, could be gleaned from the trial record.  Quite simply, Stallings's assertion that counsel were ineffective for failing to present a comprehensive theory of mitigation that fairly presented evidence of his brain impairment and other functional limitations to the jury arises primarily from evidence outside the record – from materials counsel did not gather, did not present, and did not argue at trial.  Accordingly, the

Court holds that Richey counsels it to address the merits of sub-claims (a) and (b) of Stallings's ninth ground for relief.

The Ninth District Court of Appeals also found that Stallings failed to support his assertion that counsel were ineffective for failing to investigate and present adequate family background information with evidence dehors the record.  It reasoned that much of the information contained in the family members' affidavits used to support this claim overlapped with what was presented through the testimony of one mitigation witness during trial.  Thus, it concluded, Stallings could have raised this issue on direct appeal.

The Court cannot find that the Ninth District Court's ruling on this issue falls within the scope of the Richey holding.  As the Court will discuss below, the family member affidavits certainly add depth to the social upbringing information supplied by Stallings's cousin, Karen Redmon, during the mitigation hearing.  Indeed, the scope of the abuse Stallings suffered and which counsel could have presented was far more extreme than the jury was told.  Because Redmon's testimony at least touched on the most significant mitigating aspects of Stallings's family background, however, the Court can not say that the Ninth District's holding that Stallings could have raised this issue on direct appeal is wholly inaccurate.

Moreover, in a footnote in its opinion, the Ninth District Court observed that Stallings's original petition was missing several affidavits in support of the family background claims. Because the trial court did not permit Stallings to amend his petition, the Ninth District concluded that it could not review those affidavits when addressing Stallings's claim.  State v. Stallings, 2000 WL 422423 at *2 n.5.  Thus, based on the Ninth District's holding and Stallings's failure to timely submit some of the affidavits in support of these claims to the post-conviction

-60-

court, this Court finds that sub-claim (e) of Stallings's ninth ground for relief is procedurally defaulted.

Finally, the Ninth District Court of Appeals held that Stallings's grounds for relief pertaining to counsel's failure to procure an expert on gang cultures and a toxicologist to discuss drug abuse could have been raised on direct appeal.  It also stated that the affidavits used to support the claims "merely contradict the strategy used by Defendant's trial counsel."  Id. at *2.  It concluded that, because defense counsel's actions, or inactions, appear on the face of the trial record, these claims were barred by res judicata.

Like the Richey Court, this Court finds that, while the absence of reports from these experts is patent from a review of the trial record, "the only way that [Stallings] could make out a violation of his constitutional rights was to adduce evidence establishing what his counsel *would* have learned . . ." Richey, 498 F.3d at 360 (emphasis supplied).  Additionally, the conclusion that one can assess the strategic nature of counsel's decisions on these points without access to the information counsel did not pursue seems illogical.  Accordingly, as the Richey Court before it, this Court holds that it may review the merits of sub-claims (c) and (d) of Stallings's ninth ground for relief.

### 2. Applicable Law

Having conducted its procedural default analysis, the Court must now address the merits of the sub-claims.  The Court reviews them while subjecting them to the standards set forth in Strickland v. Washington, 466 U.S. 668 (1984), as expatiated in Wiggins v. Smith, 539 U.S. 510 (2003).  In Wiggins, the Court held that counsel's failure to investigate and present to the jury mitigating evidence was unreasonable.  There, the Court held that trial counsel's failure to

discover evidence of the petitioner's difficult childhood was a Sixth Amendment violation.[19]

The Court found that counsel's decision not to expand their investigation in the wake of

reviewing several documents diagnosing the petitioner's mother as an alcoholic and disclosing

the petitioner's placement in several foster homes was an abdication of the duties imposed on

counsel pursuant to Strickland.

The Wiggins Court cautioned, moreover, that "a court must consider not only the

quantum of evidence already known to counsel, but also whether the known evidence would lead

a reasonable attorney to investigate further." Id. at 527.   While Strickland established that

strategic decisions generally are not subject to challenge, therefore, the Wiggins Court

emphasized that these decisions are not immune from attack if they are founded upon an

unreasonable investigation.  Id.  Finding that the information the petitioner's trial counsel

already had reviewed triggered a duty to investigate the petitioner's background further, the

Court held that trial counsel's actions were objectively unreasonable under Strickland.

To discern whether a petitioner was prejudiced by counsel's actions, a habeas court must

determine "whether there is a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different."  Rompilla v. Beard, 545 U.S. 374, 376

(2005)(internal quotation marks and citations omitted); Dickerson v. Bagley, 453 F.3d 690 (6th

---

[19]    The Court noted the extensive hardships the petitioner faced during childhood:
                    [P]etitioner's mother, a chronic alcoholic, frequently left Wiggins
             and his siblings home alone for days, forcing them to beg for food and to
             eat paint chips and garbage. Mrs. Wiggins' abusive behavior included
             beating the children for breaking into the kitchen, which she often kept
             locked.  . . .   Petitioner's first and second foster mothers abused him
             physically and . . . the father in his second foster home repeatedly molested
             and raped him.
       Id. at 516-7 (citations omitted).

Cir. 2006).

In the wake of Wiggins, both the United States Supreme Court and the Sixth Circuit have issued several opinions further explaining counsel's obligations in the mitigation phase of a capital trial.  In Rompilla, the Supreme Court held that, despite the defendant's and family members' protestations that no mitigation evidence existed, counsel had a duty to investigate for such evidence, including reviewing prior court files that the prosecution intended to utilize.  Had counsel reviewed those files, the Court surmised, they "would have become skeptical of the impression given by the . . . family members and would unquestionably have gone further to build a mitigation case." Rompilla, 545 U.S. at 391.  The Court found that extensive mitigating evidence existed but was never presented to the defense team's mental health experts, who, consequently, found "nothing helpful to [Rompilla's] case." Id. at 392 (internal quotation marks and citation omitted).

The mental health experts obtained during state post-conviction proceedings, who had been supplied with school, medical, and prison records that trial counsel had never procured, found that the petitioner suffered from organic brain damage, an extreme mental disturbance, and impairment in several cognitive functions.  Id.  Confronted with this array of mitigating evidence that counsel failed to procure and introduce to the jury, the Rompilla Court held that counsel's failure to review the court files from the petitioner's prior convictions was unreasonable behavior and prejudicial to the outcome of the sentencing phase of trial.

The Sixth Circuit held in Hamblin v. Mitchell, 354 F.3d 482, 486 (6th Cir. 2003), that courts must review trial counsel's actions in light of the American Bar Association's guidelines.  Those guidelines suggest the need for counsel to explore a petitioner's medical, educational, and

employment history, as well as obtaining a family and social history through, *inter alia*, contact with family members.  Id. at 487 n.2.  The guidelines also state the necessity of reviewing a multitude of records to provide counsel with clues regarding the client's "childhood abuse, retardation, brain damage, and/or mental illness . . . ."  Id.[20]  When analyzing an ineffective assistance of counsel claim on habeas review, a court should consider both the evidence adduced at trial and the evidence adduced in a habeas hearing.  Towns v. Smith, 395 F.3d 251, 257 (6th Cir. 2005).

The Sixth Circuit provided further guidance to habeas courts in Dickerson v. Bagley, 453 F.3d 690, 696 (6th Cir. 2006), opining that precedent such as Wiggins, Rompilla, and Hamblin, require that trial counsel's "strategic choices made after less than complete investigation will not pass muster as an excuse when a full investigation would have revealed a large body of mitigating evidence."  It concluded that, an incomplete mitigation investigation resulting from "'inattention, not reasoned strategic judgment' is unreasonable, as is abandoning 'investigation at

---

[20]    The Guidelines further state that any investigation for the sentencing phase of trial should include, but not be limited to:

> medical history, (mental and physical illness or injury, alcohol and drug use, birth trauma, and developmental delays); educational history (achievement, performance and behavior) special educational needs (including cognitive limitations and learning disabilities); military history (type and length of service, conduct, special training); employment training history (including skills and performance, and barriers to employability); family and social history (including physical, sexual or emotional abuse); prior adult and juvenile record; prior correctional experience (including conduct on supervision and in the institution, education or training, and clinical services); and religious and cultural influences.

ABA Guidelines at 11.4.1.(2)(B) (1989).  The ABA has published several editions of the Guidelines.  The Court utilizes the 1989 edition of the guidelines as that was the most recent edition published at the time of Stallings's trial.

an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible.'" Id. (*quoting* Wiggins, 539 U.S. at 527-28).   Counsel not only have the duty to procure experts to aid them in investigation and subsequent formation of a mitigation strategy, but also have a concomitant duty to learn enough about the expert's conclusions to "make a reasoned determination about whether [to] abandon a possible defense based on [the] expert's opinion." Richey v. Bradshaw, 498 F.3d 344, 363 (6th Cir. 2007)(*citing* Rompilla, 545 U.S. at 387).

### 3. Factual Background

The main thrust of Stallings's ineffective assistance of counsel during mitigation claim arises from counsel's failure to discover evidence of his organic brain impairment and present it to Dr. Bendo before the penalty phase of trial.  He also claims that counsel should have procured more background information, especially as it would relate to, or be reflective of, this organic brain impairment, and, in this context, should have sought out experts in gang culture and drug abuse.  To assess the validity of these allegations, the Court must begin with the investigation that counsel actually conducted and the mitigation presentation that resulted therefrom.

Counsel's first witness was Stallings's cousin, Karen Redmon.  She testified that Stallings had a difficult upbringing, particularly because of his mother's, Patricia Phillips's, lack of parenting skills.  (Trial Tr., Vol. 16, at 29).  She stated that, on the few occasions that Phillips visited Redmon with Stallings's two siblings, the children were dirty and smelled like urine.  Id. at 30.  Redmon testified that, while Phillips and the current man in her life often would eat steak, she fed her children only grits.  Consequently, when the Stallings children arrived at Redmon's home, she stated that they would be very hungry.

-65-

Trial counsel elicited testimony from Redmon regarding abuse that Stallings suffered as a child.  She testified that Stallings told her that he was abused by their cousin's husband.  She further stated that, although Stallings had informed his mother about this abuse, his mother refused to believe it actually occurred, and took no further action.  Because of his mother's neglect, Redmon opined, Stallings became involved with the Crips gang "to have the family that he didn't have at home."  Id. at 35.

Defense counsel next called the Reverend John Wiseman to testify.  Reverend Wiseman was a prison clergy member who had visited Stallings several times after his incarceration.  He stated that, unlike other prison inmates, Stallings expressed sincere remorse for his crime and the fact that Christopher would be raised without a mother.  Reverend Wiseman revealed that Stallings had shed "a lot of tears," even though that was unusual in a prison environment.  Id. at 45.  Finally, Reverend Wiseman shared that Stallings had expressed an interest in Bible study and was attending study sessions with him.

Akron Police Detective Gerald Miles next took the stand for the defense.  Detective Miles had interviewed Stallings after he was apprehended for the Shephard murder.  During the course of the confession, Detective Miles stated, Stallings began to cry.  Stallings revealed to Detective Miles that he had trouble sleeping since the incident and would often wake up screaming after dreaming about it.  Id. at 55.  He told the Detective that he "felt relieved to get [the] confession off of him or get this incident kind of out in the open."  Id.

Counsel adduced testimony from Robert Cox, the acting supervisor of the Ohio Adult Parole Authority.  Cox testified about the change in the law that had occurred on July 1, 1996.  On that date, the Ohio legislature enacted Senate Bill 2, which provided for a life without parole

sentence for criminal defendants convicted of aggravated murder.  Id. at 63.  Before the

enactment of this Bill, Cox explained, a capital jury's life sentence options both involved

eligibility for parole.  Cox also informed the jury that a defendant can acquire "bad time," or

additional time added to his or her original sentence if he or she behaves poorly while in prison.

Id. at 66.

Defense counsel next called Dr. Bendo to testify on Stallings's behalf.  Dr. Bendo

explained that the purpose of his testimony was to describe Stallings's background and

personality development as well as explain his psychological processes at the time the crime

occurred.  Id. at 84.  Dr. Bendo first depicted Stallings's family life, noting that Stallings's father

was absent and his mother "tended to lose interest [in him] and was not really there for him in

any observable way."  (Trial Tr., Vol. 16, at 84).  After Stallings was charged with the Shephard

murder, Dr. Bendo noted, his family members moved to Alabama and ceased all further contact

with him.

Although Dr. Bendo opined that his mother was a negative influence in his life, he

testified that Stallings's aunt, Rosie Butler, who had raised his mother, was a family member

with whom Stallings felt close.  He observed that Stallings often offered her money to assist her

and that he had a close relationship with her husband, Jefferson Butler.  Dr. Bendo reported that,

Jefferson Butler's death, which occurred in 1993, was "quite a blow" to Stallings.  (Trial Tr.,

Vol. 16, at 98).

Dr. Bendo reviewed six psychological reports obtained in Stallings's developmental

years.  He noted that Stallings previously had been diagnosed with Attention Deficit

Hyperactivity Disorder or ADHD.  He also stated that psychological reports indicated that

Stallings had endured physical abuse by his step-father and neglect by his mother.  He noted one report in particular in which Stallings was diagnosed with mild mental retardation and some psychotic-like symptoms.

Dr. Bendo relayed the learning difficulties Stallings had in his childhood years but did not indicate that there was any basis upon which to opine that he suffered from brain damage.  He testified as follows:

> He also had a very low reading level, it's estimated in most reports to be at the first-grade level and one report to be at the third-grade level, which would be my estimate.

> His IQ is below average and the borderline range on all estimates of intelligence.

> He's had several head injuries but there's no indication that there was any damage, that brain damage occurred.  He has some history of some very severe head injuries.[21]

> He has a history of alcohol and drug use and abuse and, as I mentioned before, the gang affiliation I think was a handicap in some ways because it exposed him to danger or, you know, criminal kinds of activity.

(Trial Tr., Vol. 16, at 91).  Dr. Bendo explained that Stallings was a follower, rather than a leader, that he wanted to feel included and accepted.  He stated that Stallings attended five different elementary schools up to the age of ten, at which time he began living on the street.  By age 12, Dr. Bendo reported, Stallings had become involved in gang activity, becoming a member of the Crips.  Gang membership, Dr. Bendo opined, gave Stallings a feeling of "belonging to a group that has similar values and interests and show interests in each other and it's sort of a, you know, fraternity in a sense."  Id. at 92.

---

[21]    Importantly, defense counsel elicited this testimony on direct despite the fact that Dr. Bendo told counsel that evidence of head injuries could be indicative of brain damage.  See discussion, supra, at 13; Wiggins, 539 U.S. at 527-28.

Based on tests Dr. Bendo performed during his evaluation, he found that Stallings suffered from significant depression and had suicidal tendencies manifesting in suicide attempts throughout his life.  He offered no formal diagnosis of Stallings's personality, however.  When defense counsel queried with what type of personality Dr. Bendo would diagnose Stallings, he responded that, "It was very hard to come up with one diagnosis for him," because Stallings, "[did not] clearly fall into any categories."  Id. at 103-104.

Dr. Bendo observed that Stallings was remorseful over the crime.  One of the first things about which Stallings told Dr. Bendo was a recent dream he had in which he was at the funeral home with the victim, who emerged from the casket, embraced him, and stated that she forgave him.  Stallings revealed to Dr. Bendo that he cried regularly while thinking about that dream.  Id. at 96.

Dr. Bendo also discussed Stallings's short employment history.  He stated that at a juvenile institution called Tico, Stallings acquired barbering skills and appeared to have a particular ability in this area.  He also stated that, while Stallings had no formal work history, prior to his arrest he had been hired to work at Jacobs Field baseball stadium.  Dr. Bendo stated that he believed Stallings's predominant means of supporting himself was through selling drugs.

Dr. Bendo offered his opinion about Stallings's thought processes on the night of the crime.  He explained that one of the robbery participants, Marc Lee, was another member of the Crips gang who held a higher rank than Stallings.  Thus, Dr. Bendo revealed that Stallings felt compelled to participate in the robbery once Lee suggested it.  Dr. Bendo noted that Stallings was drunk and high when the crime occurred.  He indicated that Stallings trusted fellow gang members who indicated to him that the weapon they provided him for the robbery was unloaded.

-69-

Id. at 101.

Finally, Stallings provided an unsworn statement.  He apologized to the victim's family, indicating that he did not mean to kill her.  He indicated to the jury that he felt responsible for Shephard's death and that he did not surrender to authorities immediately after the murder because he was afraid.  He stated that, while he fled the crime scene, he remained concerned over Shephard's well-being.  Id. at 123.

Although the Court granted habeas counsel's request to depose trial counsel, neither recalled much regarding the strategy employed at the mitigation phase of the proceedings.  Trial counsel Thomas A. Teodosio recalled that counsel's mitigation strategy was to focus on "his youth, the conditions he grew up, his - - you know, his remorse because I recall, you know, him breaking down and crying during the - - after he was arrested, his cooperation with the police officers."  (Doc. 41, at 7).   Teodosio did not recall speaking with Dr. Bendo about indications of brain damage or reviewing any records indicating Stallings suffered from it.  Id. at 29.

Kerry O'Brien's deposition testimony was similar.  He recalled the mitigation strategy was to focus on Stallings's youth, his difficult upbringing, and family abandonment.  He did not recall reviewing any records indicating that Stallings had sustained severe head injuries or that he was diagnosed with brain impairment.  When asked whether he recalled if Dr. Bendo was qualified to diagnose individuals with brain damage, O'Brien responded that he was not certain. (Doc. 43, at 32).  Neither counsel recalled having pursued a mitigation strategy that focused on, or even highlighted, Stallings's functional limitations, borderline mental retardation, or brain impairment.

Having depicted what occurred during the penalty phase and the memories of trial

-70-

counsel's preparation for it, it is necessary at this juncture to review the evidence habeas counsel introduced in support of the ineffective assistance of counsel claims during the evidentiary hearing before this Court.

As stated above, Stallings called George Hoffman, the acting principal at the Cuyahoga Hills Correctional Institute at the time Stallings attended that school, as the first witness. Although he had been a guidance counselor at that facility and had overseen the education of over 60,000 students as one of its employees, he had an independent recollection of Stallings because he was the only student Hoffman ever had who suffered from both a severely low I.Q. and an SBH diagnosis.  Although at the time Stallings attended the institution he was almost seventeen years old, Hoffman testified that Stallings's day-to-day functioning level was approximately that of a seven-year-old and his academic abilities were those of a first grader. (Doc. No. 94, at 14-15).  He described Stallings as a follower who was "picked on" much of the time by other students housed in his cottage or dorm.  Id. at 14.  Hoffman stated that, while he would have been willing to testify at Stallings's trial, if asked, no one from the defense team ever contacted him.  Id. at 20.[22]  He also testified that he had no recollection or record of anyone requesting Stallings's records prior to a request for them by post-conviction counsel.  The Court concludes, accordingly, that no request for the DYS records was ever made by trial counsel and that the Respondent's argument that it is theoretically possible that such a request occurred is

---

[22]     While, on cross-examination, Hoffman admitted that, while unlikely, defense counsel *could* have procured Stallings's school records without his knowledge, there is no indication in the record that they did so.  Id. at 37.  Specifically, there is no record of a request for those records having been made, trial counsel had no recollection of ever asking for or seeing them, and there is no evidence of the records or the information therein in trial counsel's files.

unpersuasive.  Rompilla, 545 U.S. at 391.

Habeas counsel next called Dorian Hall, the current supervisor of mitigation specialists and criminal investigators in the Office of the Ohio Public Defender, to testify.  Hall provided her opinion regarding the sufficiency of defense counsel's investigation for mitigating evidence.  While Hall conceded that it is the trial attorneys who ultimately formulate mitigation strategy, she emphasized the importance of conducting a thorough mitigation investigation by interviewing the client and contacting former educators.  Hall averred that medical records of a client may be scant if the client comes from a poor background for a variety of reasons.  She stated that much of her past clients' medical care came from clinics and emergency rooms.  Hall also testified that, if there was abuse in the home, parents typically would not seek medical treatment for a child's injuries for fear of involving the Department of Children's Services. (Doc. No. 94, at 52).

As a mitigation specialist, Hall stated she routinely would review a client's file for indications of organic brain damage even if medical records did not document any.  She noted in Stallings's case in particular that the record was replete with "red flags" that should have triggered counsel's duty to investigate for organic brain impairment.  Specifically, she underscored Stallings's low I.Q. and difficulty mastering long and short vowel sounds.  Id. at 59.  Most blatant were the school evaluations that indicated organic impairment and an SBH designation for Stallings.  Based on her experience with reviewing these types of records, Hall testified that, without question, counsel should have requested a neurological psychiatric evaluation to investigate for possible brain damage.  During cross-examination, Hall admitted that she is not an attorney and does not assess what information should be presented to the jury.

-72-

As stated above, Dr. Burch examined Stallings during his state post-conviction proceedings.  After reviewing the record and performing several psychological tests, Dr. Burch stated that Stallings suffers from "a moderate level of cerebral brain impairment."  (Doc. 94, at 88).  She explained that the diagnosis "moderate" is approximately a score of six in a range of one through nine.  She concluded that Stallings's brain impairment manifested in his limited ability to read and write, to plan and organize, and to self-monitor and direct his behavior.  When asked during the evidentiary hearing before this Court what caused this brain impairment, Dr. Burch responded that several factors, such as heredity (Stallings's siblings also had records of severely low I.Q.s), Stalling's head injuries, and his early and significant abuse of alcohol and drugs, were all likely factors.  Id. at 97.

Dr. Burch also testified that the circumstances surrounding the murder were consistent with Stallings's limited intellectual functioning.  She noted that, while his co-defendant had testified that Stallings was told not to enter the house they intended to rob until after the others had entered, Stallings proceeded to enter with them.  She observed Stallings's lack of motive for either the robbery or the shooting and his extreme remorse thereafter.   During cross-examination, however, Dr. Burch admitted that, despite his impairments, Stallings had the ability to differentiate right from wrong.  Id. at 149.

Dr. Burch testified that, even a psychologist who is not trained specifically in neuropsychological evaluations, would have been put on notice by the DYS reports indicating that Stallings had organic impairment, by reports that he had suffered from head injuries as a child, by evidence of his functional limitations, and by evidence hat he began abusing drugs at an early age, to inquire further into the possibility of brain damage.  Id. at 153-54.

-73-

The Respondent thereafter called Dr. Bendo to testify.  Dr. Bendo stated that the only indicator of brain damage of which he was aware at the time of Stallings's trial was his history of head injuries.  He says he reviewed five psychological reports but found nothing contained therein to indicate the presence of brain damage.  And, he stated that he found no evidence of brain damage in his own psychological testing.  (Doc. No. 94, at 177).  During cross-examination, Dr. Bendo admitted that he had reviewed files indicating that Stallings had abused drugs at an early age and that he had two siblings who were low functioning with a low I.Q., and that both of those facts would be supportive of a finding of organic impairment.  When asked, moreover, whether the results of the Bender Gestalt test performed by Dr. Politzer indicated that Stallings suffered from organic brain impairment, Dr. Bendo replied that it is "possible."  Id. at 189.  Dr. Bendo stated that he was not provided with Stallings's DYS and Cuyahoga Hills records, however, and that he was unaware of the organic impairment and SBH findings in those records, or of the fact that the Bender Gestalt test had even been administered.[23]  Dr. Bendo also indicated that counsel did not ask him to pursue the question of possible brain impairment.  On this point, Dr. Bendo indicated that he did discuss the possibility of Stallings's brain damage with counsel.  He testified as follows:

> Q:    Did you have – did you indicate to [habeas co-counsel] that you discussed
>       with counsel the possibility of Michael having brain damage with trial
>       counsel?
> A:    Yes, based on the head injuries, yes.
> Q:    So did you – you did – I'm trying to – I'm trying to be fair with you.  You
>       did discuss with trial counsel the possibility that Michael could have brain
>       damage based on head injuries?
> A:    Yes.

_____

[23]    The DYS records contained in the current habeas record were introduced as
exhibits to Stallings's first post-conviction relief petition in state court.

-74-

Id. at 190.  Despite this discussion, counsel apparently did not seek to develop the record on this issue.

### 4. Analysis of Sub-Claims Presented in the Petition -  Sub-claims (a), (b), (c), and (d) - neurological brain impairment, incomplete psychological evaluation, substance abuse evidence, and cultural evidence[24]

Stallings first asserts that counsel were ineffective for failing to present evidence of Stallings's organic brain impairment during the mitigation hearing.  He asserts that, had counsel procured the DYS documents created by Drs. Rita Politzer and Minnie Bowers that indicated Stallings suffered from organic brain impairment, they could have presented these documents to Dr. Bendo and, ultimately, to the jury during the mitigation hearing.  He also takes issue with Dr. Bendo's failure to recommend, and counsel's failure to procure, a neuropsychologist to examine Stallings and assess him for brain damage.  Finally, Stallings argues that Dr. Bendo was deficient in failing to diagnose Stallings with any specific mental health problems.

During post-conviction proceedings, Stallings sought and procured his DYS records.  As indicated above, one such record clearly states that Stallings suffered from, among other things, "organic impairment."  (Appendix, Vol. 4, at 213).   Those records also disclosed the positive findings from the Bender Gestalt test for organic impairment and Stallings's SBH diagnosis, and contained descriptions of Stallings's severe functional limitations.  Trial counsel could offer no explanation during their depositions as to why they had not obtained these records.  Hoffman testified during the evidentiary hearing that the DYS records were under his control at the time of trial and would have been available to trial counsel upon request.  Because of the clear indication

---

[24]     The Court specifically excludes from the above discussion any review of the merits of sub-claim (e), evidence regarding Stallings's family background, because, as is discussed above, this claim is procedurally defaulted.

-75-

of brain impairment and other severe psychological and functional limitations therein, the Court finds that defense counsel's failure to procure those records and/or provide them to Dr. Bendo was unreasonable. As the Sixth Circuit observed in Hamblin, ABA Guidelines *require* counsel to obtain this basic information. Had Dr. Bendo been made aware of these documents, it is likely he would have suggested referring Stallings for neuropsychological testing. It is even more likely, moreover, that Dr. Bendo at least would have tempered the testimony he provided at trial on this important point.[25]

In addition to counsel's failure to procure the DYS documents indicating brain damage, as Dr. Burch testified during the evidentiary hearing, counsel otherwise should have been attuned to the obvious indicators of possible brain damage. As Dr. Burch stated, even one who is not trained specifically in neuropsychological evaluations should have been alerted to the need for a neuropsychological examination for brain impairment based on Stallings's head injuries as a child, his diagnoses of ADHD and SBH, his drug abuse at an early age, his low I.Q., the low I.Q. of his siblings, and his psychological test results. Id. at 153-54. The Court therefore finds that, even in absence of the documents containing an express diagnosis of brain damage, Dr. Bendo and counsel should have been aware of the possibility that such an impediment existed, or at least that inquiry into that possibility was needed.

_____

[25]     Although Dr. Bendo testified during the evidentiary hearing that, based on Stallings's head injuries, he discussed the possibility of brain impairment with defense counsel, he specifically testified during trial that there was "no indication that there was any damage, that brain damage occurred" because of these injuries. (Trial Tr., Vol. 16, at 91). Counsel, accordingly, not only did not pursue a possible line of important inquiry, but actually elicited testimony from their own witness implying that an inquiry was undertaken, with negative results. As the record now makes clear, any such inquiry likely would have justified the opposite conclusion.

-76-

Having determined that counsel failed to procure essential documents diagnosing Stallings with organic brain impairment and disclosing his behavioral impairments and severe functional limitations, and failed to provide these documents to the defense psychologist or some other expert once procured, the Court now must determine whether this deficiency and the defense team's failure to request a neuropsychological evaluation, prejudiced the outcome of the mitigation hearing. Lockhart v. Fretwell, 506 U.S. 364, 372 (1993).

While cases like these are rarely amenable to clear-cut resolution, the Court ultimately finds that counsel's failures on this issue prejudiced the outcome of the mitigation proceedings. Id. As Dr. Burch stated in her evidentiary hearing testimony after reviewing the record and performing several psychological tests, Stallings suffers from "a moderate level of cerebral brain impairment." (Doc. 94, at 88). The Court cannot find that the jury would have been indifferent to such a diagnosis. As Dr. Burch indicated, though certainly not excusing his behavior, the circumstances surrounding the murder were sufficiently consistent with, and indicative of, Stallings's limited intellectual functioning, that the Court can not say that the jury would not have found that fact meaningful in its sentencing assessment.

Although not identical, these circumstances are similar to those in Frazier v. Huffman, 343 F.3d 780 (6th Cir. 2003), cert. denied, 541 U.S. 1095 (2004), where the Sixth Circuit found that counsel acted in violation of Strickland. In that case, the petitioner sustained a brain injury that impaired his brain functioning. Id. at 794. Although aware of this injury, counsel did not investigate its occurrence or the possible impact it may have had on the petitioner's behavior and commission of the crime. Counsel also failed to present any mitigating evidence other than the petitioner's unsworn statement during the mitigation phase of trial. The Sixth Circuit held that

counsel's failure to investigate could not be part of a reasonable trial strategy.  Id. at 795.  Thus, it concluded, the state court had unreasonably applied Strickland in its contrary finding.

Unlike in Frazier, counsel here did present evidence, albeit limited, regarding Stallings's mental deficiencies.  Similar to Frazier, however, defense counsel were aware, based on Dr. Bendo's discussions with them, that Stallings had suffered head trauma that could be indicative of an organic brain impairment, yet counsel failed to investigate that fact any further.  Because counsel did not procure or produce vital documents for the defense psychologist regarding Stallings's brain damage and limited functional capacity, and subsequently inform the jury of the information in those documents, and did not pursue the question of potential brain impairment at all, the Court cannot indulge the presumption that counsel's failure to introduce such evidence was part of a reasoned defense strategy.  As in Wiggins, there is no support, either from defense counsel or other portions of the habeas record, to justify the conclusion that counsel's failure to fully investigate Stallings's background was part of a professional judgment to limit the mitigation investigation.  Wiggins, 539 U.S. at 527.  There was simply nothing to be gained from not presenting evidence of a brain impairment to the jury.  Moreover, because the sentencing jury heard no information about Stallings's brain impairment, (and, indeed, were told that there was no evidence that such an impairment existed), the Court cannot be confident that the jury's sentencing decision would have remained unaltered had it known this information.  Accordingly, the Court finds Stallings's assertion that counsel were ineffective for failing to investigate and introduce evidence of Stallings's brain impairments during the mitigation phase of trial is well-taken.

The Respondent asserts in the return of writ that this Court should find Stallings's claim

-78-

has no merit based on the holding in <u>Smith v. Anderson</u>, 104 F.Supp.2d 773, 809-10 (S.D. Ohio

2000).  In that case, Dr. Burch also examined the petitioner and found that he suffered from

"cerebral dysfunction."  <u>Id.</u>  The <u>Anderson</u> court found no ineffective assistance of counsel,

however, concluding that:

> Petitioner has not made the required showings, and in fact, he has offered nothing
> to substantiate his bare allegations. Further, it is apparent that trial counsel made a
> strategic decision after an investigation of the facts not to pursue this line of
> defense. When Petitioner initially pled "Not Guilty by Reason of Insanity,"
> counsel had the benefit of multiple psychological examinations of Petitioner.
> Once the initial examinations were completed, Petitioner's plea was later changed
> to not guilty. To require investigations into every possible mitigation defense,
> regardless of any basis for such, creates an impossible standard of effectiveness
> and imposes a burden upon defense counsel that is not now required by the
> Supreme Court.

<u>Id.</u> at 810.  Thus, based on that petitioner's prior psychological examinations, the <u>Anderson</u> court

held that counsel had not acted unreasonably in failing to procure yet another psychological

expert.  Because the facts presented in <u>Anderson</u> differ from those presented here, the Court finds

the <u>Anderson</u> holding distinguishable.  There is nothing in this record to support the conclusion

that counsel made an informed strategy decision not to present psychological evidence of which

it was aware to the jury.  The evidence simply was never ferreted out.  There is, in addition,

strong evidence in the DYS and Cuyahoga Hills records not only of the fact of a brain

impairment, but of the severe toll it took on Stallings's ability to function.  For these reasons, it is

clear that this case is simply not the same as that which faced the Court in <u>Anderson</u>.

Also distinguishable from the facts presented in the instant case are the circumstances

found in <u>Fautenberry v. Mitchell</u>, 515 F.3d 614 (6th Cir. 2008).  There, the Sixth Circuit held that

counsel were not ineffective for conducting an inadequate mitigation investigation or for failing

to procure "reasonable and necessary experts."  In that case, the petitioner argued that counsel

were ineffective for hiring a psychologist who found that the petitioner did not suffer from organic brain damage.  Id. at 625.  The Sixth Circuit held that counsel did not act unreasonably by relying on the psychologist because, "'a licensed practitioner is generally held to be competent, unless counsel has good reason to believe to the contrary.'"  Id. (*quoting* Lundgren v. Mitchell, 440 F.3d 754, 772 (6th Cir. 2006)).  The Sixth Circuit also found that the petitioner failed to establish prejudice because to do so he must establish that "'the new evidence . . . differ[s] in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing.'"  Id. (*quoting* Clark v. Mitchell, 425 F.3d 270, 286 (6th Cir. 2005)).  Concluding that the evidence the petitioner presented during the habeas proceedings was substantially similar to that presented at trial, the Sixth Circuit denied habeas relief.

This matter is easily distinguishable from Fautenberry.  Dr. Bendo's professional opinions were only as sound as the information counsel provided him.  Thus, counsel acted unreasonably, not in relying on his opinion, but for failing to provide him with complete data on which to base it.  Moreover, unlike the Fautenberry petitioner, Stallings demonstrated, through the DYS records and the testimony of Dr. Burch, that there is indeed strong evidence that he suffers from organic brain impairment.  The sentencing jury knew nothing about this deficiency.  In fact, Dr. Bendo testified that there was nothing in the materials he had been provided that would indicate that such an impairment existed.  Thus, this recent Sixth Circuit precedent fails to alter the Court's opinion.

Stallings's final assertion regarding counsel's failure to explore his psychological deficiencies is that Dr. Bendo, unlike Dr. Burch, did not provide a specific diagnosis of Stallings under the Diagnostic and Statistical Manual of Mental Disorders ("DSM").  As highlighted

-80-

above, Dr. Bendo testified that he could not diagnose Stallings with any specific mental affliction because his test results did not place him squarely into any category.  Although Dr. Bendo found that Stallings suffers from ADHD, he did not formally diagnose him pursuant to the DSM.  On post-conviction review, Stallings argues, Dr. Sharon Pearson found that Stallings suffers not only from ADHD, but from depression and drug dependency.

The Court finds that this aspect of Stallings's sub-claims has no merit.  While Dr. Bendo apparently did not find that Stallings suffered from depression as described in the DSM, he did discuss Stallings's past depression and his multiple suicide attempts during the mitigation testimony.  Additionally, Dr. Bendo discussed Stallings's early drug use.  Thus, while Dr. Bendo did not inform the jury that Stallings was depressed and drug dependent pursuant to the criteria set forth in the DSM, as perhaps he should have done, the jury was aware of Stallings's suicidal tendencies and drug dependence based on other portions of Dr. Bendo's testimony.  While it is curious that Dr. Bendo would refuse to render a diagnosis where it seems Stallings was readily amenable to one, Stallings has not demonstrated any prejudice from the alleged deficiencies in this aspect of Dr. Bendo's testimony.

Stallings's remaining ineffective assistance during mitigation claims pertain to other evidence he asserts counsel should have developed or developed further during trial.  He claims that counsel did not present sufficient evidence of his severe substance abuse or cultural mitigation regarding gang membership and the reasons for Stallings's seeking it.

While these issues, standing alone, might not typically warrant habeas relief, when considered along with counsel's failure to procure and present evidence of organic brain impairment, they produce a prejudicial effect.  Counsel's failure to present this evidence

-81-

prevented the jury from gaining a broader understanding of Stallings's limitations based on his functional deficits and, importantly, of the potential causes of those deficits.  Had the jury heard evidence regarding Stallings's organic impairment *coupled with* evidence regarding his gang membership and the influences he was subjected to therefrom, it would have acquired a more profound understanding of why those influences shaped his behavior, both in connection with his need to seek gang membership which arose from his limited intellectual functioning, and in connection with his behavior during the commission of the crime.  Whether Stallings's drug use was a cause or an effect of his brain impairment, moreover, the introduction of additional evidence regarding the full scope of his substance abuse, particularly at such an early age, and its effects would have aided him before the jury.  As Dr. Burch suggested during this Court's evidentiary hearing, extensive substance abuse at an early age can be an important factor in the onset of brain impairment.  Thus, Stallings's drug use went hand-in-hand with his functional deficits.

Had the jury been presented with evidence describing the full extent of Stallings's organic brain impairment, along with expert testimony regarding the full extent and effects of his substance abuse, and his need to seek gang membership to provide structure to his world, the outcome of the sentencing proceeding may have been different.  The cumulative effect of presenting this evidence both could have informed the jury about Stallings's daily functionality (or lack thereof), and explained (to the extent such explanations are ever feasible) his bizarre actions during the commission of the murder.  Accordingly, the Court finds these aspects of Stallings's ninth ground for relief to be well-taken.

### G. <u>Ground for Relief Seven: Ineffective Assistance of Appellate Counsel</u>

Stallings asserts here that appellate counsel were ineffective for failing to raise the following claims on direct appeal: (a) prosecutorial misconduct during the culpability phase of trial; (b) prosecutorial misconduct during the penalty phase of trial; (c) jury instruction error regarding foreseeability instruction; (d) jury instruction errors during the penalty phase of trial; (e) equal protection claim regarding the State's use of a peremptory challenge to excuse an African-American venire member; (f) ineffective assistance of trial counsel for failure to object to prosecutorial misconduct, foreseeability instruction, causation instruction, and introduction of culpability phase evidence during penalty phase.

While the Respondent does not allege that any sub-claims are procedurally defaulted, a review of the application to reopen direct appeal reveals that sub-claims (a), (b), (c), (d), and (e) are, in fact, defaulted.  In the application, Stallings asserted appellate counsel's ineffectiveness based *only on* appellate counsel's failure to raise *ineffective assistance of trial counsel claims*. Except for sub-claim (f), none of the above sub-claims raise trial counsel issues to this Court.  As stated above, the Sixth Circuit has held that a habeas claim is exhausted only if it is raised under the same theory in federal court as it was in state court.  Lorraine v. Coyle, 291 F.3d 416, 425 (6th Cir. 2002).  Because Stallings raised sub-claims (a)-(e) as appellate failures to point out trial counsel failures in state court but raises the factual underpinnings of those claims as distinct grounds for relief here, the Court finds that they are procedurally defaulted.

Even if not defaulted, Stallings cannot demonstrate that appellate counsel prejudiced the outcome of the direct appeal by failing to raise sub-claims (a), (b), (c), (d), and (e).  Because Stallings raised, and the Court rejected, these claims as distinct grounds for relief elsewhere in this Opinion, Stallings cannot establish appellate counsel prejudiced the outcome of his appeal,

as he must to prevail.  Accordingly, the Court finds that these sub-claims are not well-taken. Lundgren v. Mitchell, 440 F.3d 754, 770 (6th Cir. 2006)("If [a petitioner] fails to prove either deficiency or prejudice, then Petitioner's ineffective assistance of counsel claims must fail.")(*quoting* Strickland, 466 U.S. at 697).

As to his Batson claim, moreover, Stallings has not asserted that claim here on the same grounds upon which he asserted it in state court and, thus, has not preserved it for review by exhausting it in state court.  Any ineffective assistance of appellate counsel claim ("IAAC") raised in the application to reopen the direct appeal is, of course, preserved for federal habeas review, but *only if* the claim raised in state court was raised under the same theory as the it is raised in the federal habeas petition.  Lorraine, 291 F.3d at 425.  Here, Stallings raised his IAAC Batson claim as follows:

> Proposition of Law No. 28: Appellant's trial counsel were ineffective for failing to contest the State's peremptory challenge of African-American juror Autumn Hill, and the court's incorrect standard used to dismiss the juror.  U.S. Const. Amend. V, VI, VIII, IX, XIV; Ohio Const. Art. I, §§ 1, 2, 3, 5, 10, 16, and 20.

(Appendix, Vol. 15, at 17).  It is clear from his application that Stallings raised the IAAC claim as an ineffective assistance of trial counsel for failure to pursue the Batson issue and object to the trial court's alleged misapprehension of the Batson test.  That claim would have been ripe for federal habeas review.

For reasons unknown to this Court, however, Stallings did not raise this claim in his federal habeas petition.  In his petition, Stallings asserts that appellate counsel were ineffective for "fail[ing] to raise as error a violation of Petitioner's right to equal protection.  Without any proper motive, the State of Ohio removed black juror, Autumn Hill, from service with a peremptory challenge."  (Doc. No. 1, at 14).  In the federal habeas petition, Stallings also asserted

-84-

IAAC claims based on trial counsel's ineffectiveness, but *not based on trial counsel's failure to assert a Batson violation*.  Consequently, the only <u>Batson</u> claim that was actually exhausted in state court – an IAAC claim based on *trial counsel's* failure to object to the trial court's mishandling of the <u>Batson</u> allegation – is not before this Court.

Accordingly, even if meritorious, the Court could not address *any* claims pertaining to the <u>Batson</u> issue raised in this ground for relief.  Stallings did not exhaust the <u>Batson</u> claim he raises in his seventh ground for relief because he raised it under a different theory in the state courts.  For whatever strategic reasons, he also has failed to allege in the federal habeas petition the one claim that was preserved for review on this issue.  It is not just a question of what is preserved for this Court's review, but of what is actually *presented to it* that limits its ability to adjudicate the merits of an issue.  Accordingly, the Court can not reach the merits of any IAAC <u>Batson</u> claim.

While it is not procedurally defaulted, sub-claim (f) is without merit.  When Stallings raised these issues to the Ohio Supreme Court in his application to reopen, that court denied the application summarily.  <u>State v. Stallings</u>, 741 N.E.2d 893 (Ohio 2001)(Table).  Because the court did not offer its reasoning regarding the merits of the claim, this Court cannot apply AEDPA deference to the Ohio Supreme Court's factual and legal findings.  As stated above, when a state court does not set forth its reasoning regarding the merits of a petitioner's habeas claim, the deference due under the AEDPA does not apply.  In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to or involved an unreasonable application of clearly established federal law, but rather conducts a <u>de novo</u> review of the claim.  <u>Morales v. Mitchell</u>, 507 F.3d 916, 930 (6th Cir. 2007)(citations omitted); <u>Newton v. Million</u>, 349 F.3d 873, 878 (6th Cir. 2003); <u>Maples v. Stegall</u>, 340 F.3d 433, 436-37 (6th Cir. 2003).

The Court has addressed the factual underpinnings of sub-claim (f) in Stallings's eighth ground for relief, above.  Because the Court found them to be without merit, Stallings cannot establish that appellate counsel were ineffective for failing to raise these claims on direct appeal.  Lundgren, 440 F.3d at 770.  This sub-claim is not well-taken.

### H. Tenth Ground for Relief: Mental Retardation

Stallings's final claim is that he is mentally retarded pursuant to Atkins v. Virginia, 536 U.S. 304 (2002), and therefore ineligible for execution.  As noted above, the United States Supreme Court decided Atkins while Stallings's initial federal habeas petition was pending before this Court.  The Court dismissed the petition without prejudice to permit Stallings to pursue a mental retardation claim in the Ohio courts.  Stallings filed a post-conviction petition alleging his mental retardation.  The post-conviction court held a hearing on this issue, ultimately finding that Stallings could not establish that he was mentally retarded.  Stallings appealed this issue to both the Ninth District Court of Appeals and the Ohio Supreme Court.  This issue is therefore exhausted and ripe for federal habeas review.

In Atkins, the Supreme Court held that the Eighth Amendment's prohibition against "cruel and unusual punishment" proscribes the execution of the mentally retarded.  Drawing its definition of this clause from "evolving standards of decency," the Atkins Court reviewed several states legislative prohibitions against executing the mentally retarded, observing that the practice of executing them had "become truly unusual."  Id. at 316.  Thus, the Court concluded that, because there appeared to be a national consensus prohibiting the execution of the mentally retarded, the Eighth Amendment's ban on cruel and unusual punishment forbids such a practice. Rather than define what constitutes "mental retardation," the Atkins Court left "'to the State[s]

-86-

the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" Id. at 317 (*quoting* Ford v. Wainwright, 477 U.S. 399 (1986)).

In the wake of the Atkins decision, the Ohio Supreme Court in State v. Lott, 779 N.E.2d 1011 (Ohio 2002), pronounced Ohio's definition of what constitutes a mentally retarded individual for purposes of execution ineligibility.  Mirroring the definitions of mental retardation of the American Association of Mental Retardation and the American Psychiatric Association, the Ohio Supreme Court found that an individual is mentally retarded, and therefore ineligible to be executed, if he or she has: "(1) significantly subaverage intellectual functioning (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18."  Id. at 1014.  Although it acknowledged that I.Q. tests are not the sole determining factor for a mental retardation finding, the Ohio Supreme Court held that "there is a rebuttable presumption that a defendant is not mentally retarded if his or her I.Q. is above 70."  Id.

Because a finding of mental retardation typically is a disputed factual issue, the Lott court opined that it was best resolved in the trial courts, where the parties could adduce evidence regarding a petitioner's mental status.  It further held that the trial courts should conduct a de novo review of the evidence, making findings by "rely[ing] on professional evaluations of [a petitioner]'s mental status, and consider[ing] expert testimony, [and] appointing experts if necessary."  Id. at 1015.  The Lott court also held that the petitioner must prove his or her mental retardation by a preponderance of the evidence standard.  "Thus, one who challenges the presumption of sanity or competence must bear the burden of proof to challenge that presumption."  Id. at 1016 (citations omitted).

-87-

Before proceeding to a review of Stallings's mental retardation claim, the Court must decide what standard of review to apply.  Pursuant to 28 U.S.C. § 2254(d), a habeas court shall not grant a writ of habeas corpus unless the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).  Thus, the Court must first decide whether the standard set forth in § 2254(d)(1) or (d)(2) applies to an Atkins claim.  This decision necessarily turns on whether the state court's finding that Stallings is not mentally retarded is a mixed question of law and fact, or is a purely factual issue.

In its prior discovery order, the Court assumed, without deciding, that § 2254(d)(2) would apply.[26]   Since issuing that order, however, it appears that circuit courts have split on this issue.  The Fifth Circuit in Clark v. Quarterman, 457 F.3d 441, 444 (5th Cir. 2006), held that "the question of whether [a habeas petitioner] suffers from significantly subaverage intellectual functioning is a question of fact, and not a mixed question of law and fact . . . ."  Id.  Recently, however, the Fourth Circuit applied the test used in § 2254(d)(1) without expressly adopting it. See Green v. Johnson, 515 F.3d 290, 300 (4th Cir. 2008)(finding that Supreme Court of Virginia correctly applied Atkins and thus its opinion was not "'contrary to' clearly established federal law.").

---

[26]     The Court reasoned in that order that, under the AEDPA, its review of Stallings's Atkins claim was confined to "whether the decision reached by the Ohio courts was an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(2)."  (Doc. 31, at 8).

While the Sixth Circuit has yet to adjudicate whether a state court finding regarding a habeas petitioner's mental retardation is a question of pure fact under § 2254(d)(2), that Court has held that the issue of whether a petitioner is competent to stand trial is a factual question.  In Mackey v. Dutton, 217 F.3d 399, 413 (6th Cir. 2000), the Sixth Circuit, contrary to its prior findings, held "§ 2254(d)'s presumption of correctness applies to a trial court's competency determination."  Id.  Although the Mackey court noted it previously had held in Cremeans v. Chapleau, 62 F.3d 167 (6th Cir. 1995), that competency determinations are mixed questions of law and fact, it concluded that the subsequent United States Supreme Court holding in Thompson v. Keohane, 516 U.S. 99, 111 (1995), superceded the Cremeans holding.  Id.

The Mackey court adopted the Thompson Court's reasoning in finding that a competency claim was purely a factual issue.  It quoted the Supreme Court, as follows:

> In several cases, the Court has classified "factual issues" within § 2254(d)'s compass questions extending beyond the determination of "what happened."  This category notably includes: competency to stand trial; and juror impartiality.  While these issues encompass more than "basic, primary, or historical facts," their resolution depends heavily on the trial court's appraisal of witness credibility and demeanor.  This Court has reasoned that a trial court is better positioned to make decisions of this genre, and has therefore accorded the judgment of the jurist-observer "presumptive weight."

Mackey, 217 F.3d at 413 (quoting Thompson, 516 U.S. at 111).

Although Mackey was admittedly a pre-AEDPA case, the Court finds these decisions controlling with respect to the proper characterization of state court findings of mental retardation.  Similar to a competency determination, a state trial court enjoys an incomparable vantage point in assessing the witnesses' and the petitioner's demeanor.  Thus, the Court finds that the Mackey and Thompson holdings, which afford a state court finding regarding a petitioner's competency to stand trial a presumption of correctness, also apply to a state court's

-89-

finding regarding a petitioner's mental retardation.  The Court therefore joins other judges on this Court[27] and holds that, to prevail on his <u>Atkins</u> claim, Stallings must demonstrate that the state court determination finding him not to be mentally retarded "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

The Court's review of the reasonableness of the state court's factual findings necessarily begins with the evidence adduced during the two-day state court evidentiary hearing.  Stallings first called psychologist Dr. Luc Lecavalier to testify.  Dr. Lecavalier tested Stallings's I.Q., determining the score to be a full-scale of 74 with a standard error of measurement of plus or minus four.  Thus, he concluded, there is a "95 percent probability that his true I.Q. score is between 70 and 78." (Trial Tr., Vol. 18, at 29).  Although Stallings was chronologically 26 years old at that time, Dr. Lecavalier testified that, with an I.Q. of 74, Stallings's approximate mental age was 13.

Stallings had taken two previous I.Q. tests in 1993, when he was 16 years old, and in 1998, just prior to his trial.  The results of these tests both found a full-scale I.Q. of 76.  Dr. Lecavalier opined that both these results were inflated because the incorrect I.Q. tests or "instruments" were provided to Stallings.  After Stallings's counsel queried whether Stallings could be malingering, or intentionally attempting to appear mentally retarded, Dr. Lecavalier found it to be "highly unlikely" based on the data that he read and what he saw when interviewing Stallings.  <u>Id.</u> at 44.  Dr. Lecavalier concluded that, based on his I.Q. test results and

---

[27]    See, e.g., <u>Murphy v. Ohio</u>, 4:96 CV 7244, Doc. No. 175 (Sept. 29, 2006)(Katz, J.)(finding state-court decision that habeas petitioner was not mentally retarded was an issue of fact subject to review pursuant to § 2254(d)(2)).

an adaptive functioning test he administered to Stallings in prison, Stallings met the first two

prongs of the mental retardation definition.

When questioned about the third prong – the onset of sub-average intelligence and skills

deficit prior to the age of 18 – Dr. Lecavalier was more equivocal.  He stated:

> A:    I think there's a lot of information that suggests that the deficits
> were present in the period of development.
>     The records clearly indicate that as soon as Mr. Stallings
> started attending school that he was having a lot of difficulties.  He
> was retained for at least one grade.
>     He was placed in special education classes and
> developmental handicapped classes which are classes for people
> that have mild mental retardation and there are an abundance of
> examples of descriptors by the family members, teachers,
> psychologists in the reports that I have read descriptors that
> indicate or describe him as functioning like someone who has
> mental retardation.
>     The difficulty is that we weren't testing him for that
> specific purpose and that's why it's very difficult for me to say that
> I'm 100 percent certain that he was mentally retarded at that point
> because we wasn't [sic] testing for it.

(Trial Tr., Vol. 18, at 44-45).

When Stallings's counsel pressed for the specifics of these descriptors, Dr. Lecavalier

responded that Stallings was bed-wetting at seven or eight, that he was described as being a

"concrete thinker" and that he "lacked understanding of personal relationships."  Id. at 49.

Stallings also was described as impulsive and immature, a follower, and easily overwhelmed by

new situations.  Dr. Lecavalier also found in Stallings's records that he was "significantly

impaired on the basis of severe neurological deficits such as learning, attention, language,

memory, and self-monitoring."  Id. at 50.  Finally, Dr. Lecavalier described one school record

indicating that at age 17 Stallings was placed in a special education setting with the objective that

he learn his body parts and their functions.  Id.  Based on these observations and the tests he

administered to Stallings, Dr. Lecavalier concluded that Stallings "functioned" like someone with mental retardation.  When counsel queried whether there was any practical difference between someone who functioned like someone with mental retardation and someone who was mentally retarded, Dr. Lecavalier responded that there was not.  On cross-examination, the prosecutor questioned Dr. Lecavalier regarding the propriety of defining mental retardation in terms of functioning.  He responded that, with the data he had, it was impossible for him to "rule out" mental retardation, although he could not state with 100 percent certainty that Stallings was mentally retarded.  Id. at 57.

The prosecutor then adduced testimony regarding the adaptive functioning test.  Dr. Lecavalier had observed that Stallings's adaptive skills showed deficits in multiple areas.  The prosecution queried how Dr. Lecavalier obtained the results, to which he responded that he had observed Stallings attempt to use a phone book and measure with a ruler while in prison.  The prosecutor then asked Dr. Lecavalier if the test was biased against people from a lower socio-economic background, who may never have the need to use a telephone book or measure an object.  Dr. Lecavalier agreed that the test assumed these skills were necessary for proper adaption.  Id. at 87.  Finally, the prosecution questioned Dr. Lecavalier about Dr. Bendo's diagnosis of Stallings.  Dr. Lecavalier conceded that, if Dr. Bendo had thought it was appropriate, he could have tested Stallings for and diagnosed him with mental retardation.

On the second day of the evidentiary hearing, Stallings's counsel called Dr. John Matthew Fabian to testify.  Although Dr. Fabian initially had been retained by the State as an expert witness, the State decided not to call him as a witness.  The trial court permitted Dr. Fabian to testify for Stallings provided that his testimony did not overlap significantly with that

-92-

of Dr. Lecavalier.

Dr. Fabian administered an I.Q. test to Stallings, at the State's behest and found a full-scale score of 72.  (Trial Tr., Vol. 19, at 9).  He indicated that Stallings's reading and spelling levels were that of a second grader and his mathematics level was that of a third grader.  Id. at 14.  Instead of observing Stallings's adaptive skill abilities for himself, Dr. Fabian used an "informant," or someone who can observe a subject's ability to perform adaptive tasks on a daily basis without prompting possible malingering arising from an awareness by the subject that he is being observed.  Dr. Fabian chose Jennifer Risinger, a case manager on the death row unit, to evaluate how well Stallings typically performs certain functions in the prison setting.  Based on the testing and report from Ms. Risinger, Dr. Fabian found both a significantly sub-average intelligence and significant adaptive function deficits.

On the issue of age of onset, Dr. Fabian concluded that it was "more likely than not" that his intellectual and functional deficiencies began prior to the age of 18.  Although he conceded that there was no actual testing for mental retardation of Stallings done prior to age 18, he indicated that it was not uncommon not to have such records because schools, which are typically the only institutions to test for mental retardation, are more likely to address questions regarding mental retardation when they identify academic disabilities or behavioral handicaps, or when requested to do so by involved parents.  He explained that Stallings's school records and family reports support the conclusion that his functional limitations and their severity were not new.  Dr. Fabian also addressed the earlier I.Q. tests and, like Dr. Lecavalier, found that, because they were improperly administered, they likely overstated Stallings's actual I.Q. at the time by a fairly

significant margin.[28]

At the close of this evidence, "at all times the Petitioner's I.Q. has been above 70."  State v. Stallings, No. CR 1997 05 1118(A), slip op., at 6 (Ohio Ct. Common Pleas Jan. 16, 2004).  Accordingly, the court held that, pursuant to Lott, Stallings would have to rebut the presumption that he was not mentally retarded by demonstrating that he was of significantly sub-average intelligence, had significant limitations in two or more adaptive skills, and that the onset of these factors occurred prior to age 18.  Although the court found both that Stallings had significantly sub-average intelligence and that he had significant limitations in his adaptive functions, it concluded that Stallings could not demonstrate that it was more likely than not that the onset of these deficits occurred prior to age 18.  It reasoned as follows:

> In finding that the Petitioner has not established that his mental retardation "onset before the age of 18," the Court finds that the testimony of the Petitioner's own experts is most compelling.  After all, neither Dr. LeCavalier nor Dr. Fabian were able to definitely conclude that the Petitioner's retardation onset before the age of 18.
>
> In his Report, Dr. LeCavalier never addresses the "onset before the age of 18" prong.  Dr. LeCavalier merely concludes in his Report that mental retardation "cannot be ruled out in all certainty **when considering the standard error of measurement of the instruments**."  Dr. LeCavalier does not say that the Petitioner is mentally retarded, only that it is *possible* that he is.
>
> While Dr. Fabian addresses the "onset before the age of 18" prong, he does not conclude that the Petitioner was mentally retarded before age 18.  Dr. Fabian simply notes that "mild mental retardation *could not* have been ruled out when Mr. Stallings was about sixteen years of age.  He exhibited adaptive deficits of the disorder and his I.Q. score is questionable at that time."
>
> The testimony and evidence that has been presented to the Court does not establish by a preponderance of the evidence that the Petitioner's "significantly subaverage intellectual functioning" and "significant limitations in two or more adaptive skills" "onset before the age of 18."  The Petitioner's own experts cannot

---

[28]     Although the reasons for Dr. Fabian's criticisms of the earlier I.Q. tests were different than those expressed by Dr. Lecavalier, their conclusion that the earlier test results were not reliable were the same.

-94-

give a definitive opinion that retardation in the Petitioner "onset before the age of
18." Dr. LeCavalier fails to address the "onset before the age of 18" prong in his
Report and Dr. Fabian only says that mild retardation cannot be ruled out.

Id. at 11-12 (emphasis in original)(citations omitted).

Stallings appealed the trial court's decision to the Ninth District Court of Appeals. Like

the trial court, the Ninth District held that, "[t]he only scientific evidence presented to the trial

court indicated that Appellant's I.Q. was above 70. Further, neither expert could state that the

onset of Appellant's mental retardation was before the age of 18." State v. Stallings, No. 21969,

2004 WL 1932869, at *4 (Ohio Ct. App. Sept. 1, 2004). The court affirmed, finding that the trial

court did not act in an arbitrary or unreasonable manner.[29]

The Court is now left with the task of determining whether the state post-conviction

courts made an "unreasonable determination of the facts in light of the evidence presented" at the

evidentiary hearing. 28 U.S.C. § 2254(d)(2). While this Court's findings may have been

different if it had heard the experts' opinions in the first instance and believes reasonable minds

could easily differ on the factual question presented to the trial court, this Court can not say that

the trial court's decision was so unreasonable that the presumption of correctness which attaches

to it can be overcome. Crediting the language in Dr. Fabian's report (and the lack thereof in Dr.

LeCavalier's), it was not unreasonable for the post-conviction court to find that there was

insufficient evidence in the record from which it could conclude that the onset of mental

retardation occurred prior to the age of 18. Thus, the post-conviction court's findings withstand

the level of review to which this Court must subject them under § 2254(d)(2).

---

[29]     As noted above, the Ohio Supreme Court declined to exercise jurisdiction. State
         v. Stallings, 821 N.E.2d 577 (Ohio 2005)(Table).

-95-

The Court reaches this conclusion reluctantly, however, and defers to the state courts' findings solely because the level of deference it must accord those findings under Section 2254(d)(2) is so high.  The experts who testified at the <u>Atkins</u> hearing appeared to be hamstrung by the paucity of evidence – particularly the fact that no institution specifically tested Stallings for mental retardation in his formative years.  Their failure to conclude affirmatively that Stallings was mentally retarded prior to the age of 18 because of this lack of evidence to the contrary is understandable.  The fact that the post-conviction court found this gap in the evidence inures to Stallings's detriment is less so.  Without precise testing for mental retardation prior to age 18, the experts' opinions appear to be as conclusive as circumstances would permit.  Both ultimately concluded that Stallings was mentally retarded and <u>both</u> opined that it was likely this mental retardation predated the age of 18.  Thus, Dr. Lecavalier found that Stallings's records, while not containing evidence of testing, did contain substantial evidence of a functional capacity consistent with that of a person suffering from mental retardation.  And, Dr. Fabian went further, opining based on his review of the entire record that it "was more likely than not" that Stallings's undisputed mental deficiencies onset before the age of 18.

The trial court did not address the testimony at the hearing regarding the age of onset in its decision, however, and focused only on the experts' written reports.  Particularly, the trial court focused on the fact that each doctor conceded that, where no testing for mental retardation is done prior to age 18, it is impossible to "definitively conclude" that mental retardation found after that age began prior to it.

It is arguable that the trial court imposed a burden on Stallings that exceeds that imposed upon him under either <u>Atkins</u> or <u>Lott</u> – <u>i.e.</u>, that it required "definitive" proof rather than proof by

a preponderance of the evidence.  Indeed, it is arguable that the trial court imposed an impossible

burden on Stallings and those similarly situated – as the doctor's testified, it is not unusual for

individuals in low socio-economic circumstances to reach the age of 18 without having the

benefit of mental retardation testing, even if the need for such testing might be evident.  In the

face of that reality, it appears Stallings's claim was doomed from the start – he could <u>never</u> prove

the third prong of the showing required to support his mental retardation claim because the trial

court found that, to do so, he would need to proffer evidence of tests that simply did not occur

(and were not likely to have occurred in his circumstances).

Indeed, it appears that the standard of proof imposed on Stallings is higher than the

burden the Ohio courts now believe is appropriate.  Thus, in <u>State v. Yarbrough</u>, No.

96CR000023, slip op. (Shelby County Ct. Common Pleas Feb. 28, 2007), the court discussed the

age of onset requirement and noted:

> The inclusion of the "onset before age 18" requirement into the definition of
> mental retardation is to demonstrate "that there was something going on during
> the developmental period." (Tr.93).  This necessitates some evidence of
> significant limitations in both intellectual functioning and adaptive behavior skills
> during that period.  (<u>Id.</u>)  Sources of information for determining onset prior to
> age 18 include records and anecdotal evidence.  (Tr. 94).

<u>Id.</u> at 11.  While the court noted that Yarbrough had been tested twice prior to the age of 18, it

did not hold that those tests were a prerequisite to a mental retardation finding.  In fact, the court

focused heavily on anecdotal evidence – from family, educators, and doctors – to search fro

indicators of "subaverage intellectual functioning and adaptive behavior skills deficits" existing

"throughout his lifetime."  <u>Id.</u>

The same types of evidence – <u>i.e.</u>, evidence of the long-term presence of severe

functioning deficits – were present here and were relied upon by both doctors (the only experts to

testify) in reaching their conclusions.[30]

Despite these concerns about the state court's reasoning, however, it remains the case that: (1) it was Stallings's burden to rebut the presumption arising from the fact that his I.Q. exceeded 70 (albeit barely so); (2) there was no evident I.Q. testing to which Stallings could point to satisfy that burden; (3) there was some I.Q. testing, which, even if questionable, arguably supported the conclusion that his I.Q. was as high as 76 prior to age 18; (4) the state courts found that Stallings did not, in fact, satisfy his burden of proof; and (5) Section 2254(d)(2) provides this Court very little flexibility to disagree with the state courts' conclusions on this issue.

If this Court were sitting in judgment in another forum, its conclusions may have differed from those of the state trial court.  Given the deference it must afford to these state court findings of fact, however, this Court may not indulge its own view of the evidence.  For the foregoing reasons, the Court must apply the deference required of it by § 2254(d)(2) and find that Stallings's tenth ground for relief is not well-taken.

**VIII. CONCLUSION**

The Court now must determine whether to grant a Certificate of Appealability ("COA") for any of Stallings's grounds for relief.  In two decisions, the Sixth Circuit determined that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability."  Porterfield

---

[30]     Interestingly, the Yarbrough court found it significant that, at age 14, Yarbrough was functioning at only a third grade level.  At age 16, Stallings functioned at a first grade level.

v. Bell, 258 F.3d 484, 487 (6th Cir. 2001); see also Murphy v. Ohio, 263 F.3d 466 (6th Cir.

2001)(remanding motion for COA for district court's analysis of claims).  Thus, in concluding

this Opinion, this Court now must consider whether to grant a COA as to any of the claims

Stallings presented in his petition pursuant to 28 U.S.C. § 2253.

> That statute states in relevant part:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –

>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .

> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA

statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole

difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate

he was denied a constitutional right, rather than the federal right that was required prior to the

AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the

pre- and post-AEDPA versions of that statute in Slack v. McDaniel, 529 U.S. 473 (2000).  In that

case, the Court held that § 2253 was a codification of the standard it set forth in Barefoot v.

Estelle, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in

the statute.  Id. at 483.  Thus, the Court determined that

> "[t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different

manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'"

Id. at 483–04 (*quoting* Barefoot, 463 U.S. at 893 n.4).   The Supreme Court has opined that, to obtain a COA a prisoner must prove "'something more than the absence of frivolity'" or more than "good faith" regarding a particular claim.  Miller-El v. Cockrell, 537 U.S. 322, 338 (2003)(*quoting* Barefoot, 463 U.S. at 893).  The Miller-El Court clarified that a petitioner need not prove that some jurists would grant habeas relief on a claim in order to obtain a COA on that issue because, as it reasoned, "a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail."  Id.

The type of analysis this Court must perform depends on the defaulted status of the claim. If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong."  Slack, 527 U.S. at 484.  A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined procedurally defaulted.  In those instances, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  Id.  (emphasis supplied).

After taking the above standard into consideration, the Court finds that one issue arguably merits further review.  The Court will address each issue and its procedural status below.

The Court finds that grounds for relief 1, 2, 3, 4(a), 5, 7(a)-(e), and 8 are unequivocally procedurally defaulted.  Because these claims were raised under different theories in state court than they were in the federal habeas petition, they are not properly preserved for federal habeas

review.  Lorraine v. Coyle, 291 F.3d 416, 425 (6th Cir. 2002).  Because they were not preserved and presented for federal habeas review in the same manner as they were presented to the state courts, however, the Court cannot issue a COA for these grounds for relief under Slack.

Similarly, the Court finds that ground for relief 9(e) is procedurally defaulted because, when Stallings raised it during state post-conviction proceedings, the court found that it was based on evidence contained in the trial record and therefore barred from post-conviction review on grounds of res judicata.  Moreover, Stallings appears to have submitted some documents in support of this claim in an untimely fashion to the post-conviction court.  Thus, the Court will not issue a COA for this claim.

While grounds for relief 4(b) and (c)(trial court instruction on "purpose" and failure to instruct on "accident") are not defaulted, the Court will not issue a COA for them.  As stated above, the trial court did not relieve the State from its burden of proving Stallings specifically intended to kill Shephard through its instructions or failure to instruct.  No jurist of reason would debate this Court's findings.

No COA will issue for ground for relief 6 (improper juror contact).  As stated in the Opinion, the trial court conducted individual voir dire of each juror who heard Beverly's statements and each avowed the statements would not impact the verdict Stallings received.  The Ohio Supreme Court was neither unreasonable for deferring to the trial court's findings on this issue nor did it unreasonably apply any United States Supreme Court precedent.  This finding is unequivocal among jurists of reason.

Equally undebatable is the Court's decision to deny ground for relief 7(f)(ineffective assistance of appellate counsel for failing to raise trial counsel claims).  Appellate counsel cannot

-101-

be ineffective for failing to raise ineffective assistance of trial counsel claims when no prejudice inured to Stallings because of trial counsel's alleged failures.  The Court will not issue a COA for this ground.

The Court finds that reasonable jurists could debate the Court's decision to deny the tenth ground for relief (mental retardation).  While the Court credited the findings of the trial court, holding that they were not unreasonable under the highly deferential standard of review this Court must employ, it is certainly debatable whether the mere lack of evidence regarding Stallings's mental retardation prior to the age of 18 should be the basis for the post-conviction court's finding that Stallings did not demonstrate the third prong of the Lott test.  Thus, the Court will issue a COA for ground for relief ten.

Finally, the Court has observed from prior capital habeas cases that counsel for the losing party routinely file a motion for reconsideration.  Counsel are advised that attorneys in capital cases are not immune from sanctions where motions are unfounded or are filed for purely tactical reasons unrelated to the merits of the positions taken therein.  If counsel file a frivolous motion for reconsideration in this, as in any case, they may be required to reimburse the opposing party for the attorneys' fees and expenses incurred in responding to such motions.  See Davie v. Mitchell, 291 F.Supp.2d 573, 634 (N.D. Ohio  2003)(Gwin, J.); Baston v. Bagley, 282 F.Supp.2d 655, 673 (N.D. Ohio 2003)(Carr, C.J.); Haliym v. Mitchell, No. 1:98CV1703, (slip op.) at 158-59 (N.D. Ohio Jan. 20, 2004)(Polster, J.).  Where counsel filing an unsuccessful motion for reconsideration are otherwise to be compensated under the Criminal Justice Act, moreover, counsel may not be compensated for the time expended in preparing and filing such motions if this Court finds the motion to be frivolous or asserted solely for purposes of delay.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal in forma pauperis would not be frivolous and can be taken in good faith.

**IT IS SO ORDERED**


  s/ Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**


Dated: March 31, 2008